THE EXECUTORS OF EDEN HAYDOCK, deceased,

v.

ELIZA P. HAYDOCK.

1. The question whether an act is the product of undue influence or not, must always be largely controlled by the state of health and condition of mind of the person alleged to have been unduly influenced.

2. Whatever destroys free agency, and constrains a person to do what is against his will, and what he would not do if left to himself, is undue influence, whether the control be exercised by physical force, threats, importunity or any other species of mental or physical coercion.

3. Undue influence is not measured by degree or extent, but by its effect; if it is sufficient to destroy free agency, it is undue, even if it is slight. ·

On final hearing, on bill, answer and proofs taken before the vice-chancellor.

Mr. Garret Berry and Mr. J. Henry Stone, for complainants.

Mr. Benjamin A. Vail and Mr. James R. English, for defendant.

THE VICE-CHANCELLOR.

The object of this suit is to set aside two gifts made by a husband to a wife shortly before his death. The grounds alleged are want of capacity and undue influence.

Eden Haydock died April 29th, 1879. He left a widow, the defendant in this suit, and an only child, a daughter by a former wife. By his will, which was executed March 23d, 1871, he gave his widow $1,000, payable immediately after his death, and an annuity of $600 during her widowhood, payable in semi-annual installments, the first payment to be made at the expiration of a year from his death. The balance of his estate is given to his daughter. His estate, exclusive of the gifts, amounts to a trifle less than $16,300. The gifts represent a value of $9,000. They were made at different

dates, the first, February 24th, 1879, and embraced nine shares of the capital stock of the United New Jersey Railroad and Canal Company, and seven bonds of the city of Rahway, having a face value of $7,000; and the second was made March 10th, 1879, and consisted of a promissory note for $5,000. Regular transfers were made, and the gifts completed by formal delivery.

The evidence respecting the state of the donor's mind when the gifts were made is very conflicting. That on the part of the complainants shows a case of utter imbecility, a mind so thoroughly decayed as to be unable to comprehend the simplest matters—and this is shown to have been its condition for some months antecedent to the time when the gifts were made; whilst the evidence for the defendant shows a mind somewhat enfeebled by the decay incident to old age, which, to some extent, had lost its original power and grasp, and in which memory was quite defective, but yet possessing sufficient vigor to understand, in a reasonable manner, the ordinary affairs of life, and to deal with them rationally. The facts and circumstances adduced by the parties in support of their opposing theories are, in my judgment, so nearly equal in force and weight, that, did the decision of the case depend solely upon the solution of the question of capacity, a problem of almost insoluble difficulty would be presented. But I think the rights in dispute may be safely and properly determined without a struggle with the difficulty just mentioned. The case hinges, I think, upon the solution of another question; one which I regard as comparatively free from difficulty.

The question to which I refer is, were these gifts procured by the exercise of undue influence? The determination of this question must always be largely controlled by the state of health and condition of mind of the person alleged to have been unduly or unfairly influenced. A mind naturally weak, or which has become impaired by age, disease or grief, is much more subject to any sort of control than one naturally strong and unimpaired. It is always, therefore, a matter of the first importance to the tribunal charged with the duty of deciding this question, to know fully the situation and surroundings, and the exact condition of

mind and state of physical health of the person alleged to have been imposed upon.

No definition of what the law denominates undue influence can be given which will furnish a safe and reliable test for every case. Each case must be decided on its own special facts. All that can be said, in the way of formulating a general rule on this subject, is, that whatever destroys free agency, and constrains the person whose act is brought in judgment, to do what is against his will, and what he would not have done if left to himself, is undue influence, whether the control be exercised by physical force, threats, importunity or any other species of mental or physical coercion. The extent or degree of the influence is quite immaterial, for the test always is, was the influence, whether slight or powerful, sufficient to destroy free agency, so that the act put in judgment was the result of the domination of the mind of another rather than the expression of the will and mind of the actor. *Turner* v. *Cheesman, 2 McCart. 243, 265 ; Executors of Moore* v. *Blauvelt, 2 McCart. 367 ; Lynch* v. *Clements, 9 C. E. Gr. 431.*

Cases of this class generally cast upon the tribunal charged with the duty of deciding them responsibilities of the weightiest character. It is the duty of the courts to inflexibly maintain the right of the citizen to exercise full and complete dominion over his property, in making such disposition of it as to him may seem proper, but they are under a duty, equally solemn and imperative, not to allow him in his old age, after his strength and vigor have departed, and he has fallen into decrepitude and weakness, to be despoiled of his property by any sort of coercion or trick. It is their duty to uphold the rights of the strong, but it is also their duty to protect the weak.

At the time the gifts were made, Mr. Haydock was upwards of seventy-five years of age ; his wife was about fifty-five. For two or three months preceding the gifts, Mr. Haydock had been confined to the house by sickness ; he was so feeble, physically, as to require assistance in dressing and undressing ; he saw few persons besides the members of his household and his physician. From the 15th of January, 1879, up to the time of his death, he

Haydock v. Haydock.

he was almost constantly in charge of his wife and her brother, George Bayright. Prior to the date just mentioned, George Bayright and his wife had kept house at Asbury Park, but at that date they closed their house, and Mrs. Bayright went to Brooklyn, and Mr. Bayright went to Rahway, where Mr. Haydock resided, and took up his residence with him, where he remained, except for short intervals, until Mr. Haydock died. Mr. Haydock and his daughter had no intercourse after the fall of 1878. On November 30th, 1878, his daughter procured a commission of lunacy to be issued against him. Before it issued, the proofs show that Mrs. Haydock had consulted counsel as to what steps it would be necessary for her to take to have a guardian appointed for Mr. Haydock, and in the conference stated that she thought he required a guardian. The commission sued out by the daughter was executed December 24th, 1878, and resulted in a finding that Mr. Haydock was then of sound mind. The evidence leaves no ground for doubt that Mr. Haydock had sufficient mind at this time to understand the nature of this proceeding. Its institution deeply wounded him. He thought it degraded him, and that it was prompted solely by mercenary motives. He did not appear before the commissioners; the condition of his health rendered it imprudent, if not dangerous, for him to do so, but he was represented by his wife and also by counsel. No evidence has been offered tending to show that he prepared the defence made to the lunacy proceedings, nor that he gave any direction or instruction concerning it. The finding of the jury gave him great satisfaction. When he first heard of it he expressed his satisfaction by exclaiming "Richard is himself again!" Even prior to this proceeding, there can be no doubt that his wife possessed a strong influence over him. There are some phases of his conduct which show that he stood in dread of her. On one or two occasions it is proved that he said, after having done something which displayed great infirmity of memory, as an offer to pay a debt a second time, "Don't tell Eliza." The attempt of the daughter to have him placed under the control of a guardian, and the defence made in his behalf by his wife, naturally had the effect of weakening the influence of the

daughter and increasing that of the wife. The wife admits that her influence over him was all-powerful. While under cross-examination she was asked if she had not proposed to her husband to make over his property to her, to which she replied she had not, but added, "I suppose if I had asked him to do so, he would have done it." If she is not mistaken in her estimate of her power, it would seem that he must have been a very plastic instrument in her hands, and that she could mould his will into any form dictated by either her interest or her fancy.

His mind at this time was in a state of decay; senile dementia had undoubtedly commenced. He was very forgetful; he did not comprehend either readily or clearly; his perceptions were blunted; all his intellectual faculties were dull and stupid. Those who had known him longest, and were best able to contrast the present condition of his mind with its state when in its original vigor, almost with one accord looked upon him as an intellectual wreck. There is evidence in the case, coming from sources entitled to great respect and confidence, which, without anything to countervail it, would be abundantly sufficient to support a finding that at the time the gifts were made, Mr. Haydock did not possess testamentary capacity, even according to the low standard fixed by the adjudications of this state. But there is countervailing evidence, and I am not persuaded that the court ought to declare the gifts void solely on the ground of want of capacity. It is certain, however, that Mr. Haydock was in a condition of extreme dependence. He was weak in body and feeble in mind; he could do little for himself; he was compelled to look to others for almost everything that could make life either desirable or endurable. He was in a position where he would be likely to be easily controlled and to yield to light influences, especially if exerted by a person in whom he had confidence, or upon whom he was dependent.

This brings us to the main question: Were these gifts the product of undue influence? The defendant says they were purely voluntary, and that she did not even know of her husband's intention to make them until he was ready to execute it. They were the subject of conversation between them, though,

according to the testimony of the defendant's brother George, they had been fully determined upon nearly a month before the first was made, and the securities which were to be the subject of them had been separated by Mr. Haydock from his other securities and their value computed. Considering the intimate and confidential relations of the parties, their constant association, and the strong inducement the husband was under to make known to his wife any generous purpose he may have entertained towards her, the reticence attributed to him strikes my mind as not only unnatural and improbable, but as a circumstance justifying the most painful suspicions. What reason is it possible to assign for this extraordinary silence? Whether the gifts were dictated by love for the wife, or by hatred for the daughter, or were the product of mingled love and resentment, the feeling was one that men do not usually conceal without a motive. It can hardly be believed that a man in his situation would have attempted to perpetrate a surprise. Childish minds are usually frank and open; they attempt no concealments and keep no secrets. If the generous purpose ascribed to Mr. Haydock had originated with him, I am unable to believe that it would have been possible for him, in his weak and dependent state, to have withheld all knowledge of it from his wife until he was ready to execute it, and the fact that she solemnly declares that he did, introduces a circumstance in support of her claim so unnatural and improbable as to shock credulity and to cast deep distrust upon her whole case.

The defendant's brother George would not say that he never heard the defendant ask or importune her husband to make over his property to her. All he can be induced to say on this point is, that he may have heard her ask him to do so, but if he did he does not recollect it. This style of testifying has very much the appearance of an attempt to suppress the truth. There are witnesses whose moral sense seems to be much less outraged by a suppression of the truth than by a downright denial of it. They seem to think the shock to conscience will be much less violent if they merely pretend to forget, than it would be if they ventured upon a bold, blunt denial. In this case, the trans-

.action inquired about had only recently occurred, if it ever occurred at all, and it was of a character likely to fasten itself so firmly upon his memory that he could not forget it. It was a thing which, if he heard, he could not forget, and if he did not hear it, he would be able to say, positively, that it never occurred in his presence. Under some circumstances, feigned forgetfulness of a fact may be very satisfactory proof of its existence.

A female servant who lived in the family of Mr. Haydock from September, 1878, up to the middle of February, 1879, swears that Mrs. Haydock talked to her husband almost every day about his money affairs; that Mr. Haydock said very little; in the language of the witness, she could hardly get a word out of him, and that his disinclination to talk about his business made her very angry. She also says that Mrs. Haydock had papers which she wanted Mr. Haydock to sign, and that she heard Mrs. Haydock say more than once, when she was angry, that she would not stay with him. This witness seemed to me to be entirely trustworthy. There was nothing in her deportment nor in her story which created the slightest doubt of the substantial truth of her testimony. She was free from all interest or bias, and had no motive to misrepresent or withhold the truth. Another female servant, who lived in the family for some weeks after the one whose testimony has just been referred to left, testifies to acts and expressions by Mrs. Haydock constituting coercion of the most offensive sort. If her testimony is true, Mr. Haydock was almost constantly, during the time she was in his family, importuned to sign papers and make over his property, by methods which, in his situation, amounted to absolute torture. But there are portions of her story which, I am satisfied, are inventions. She is also self-contradicted. Standing alone, her testimony would be entitled to no consideration whatever, but viewed, as it must be, in connection with the other evidence in the case, I do not think it can be discarded as without truth or force.

The conclusion I have reached, after listening to the witnesses, and attentively observing their manner while testifying, and after giving their evidence the most patient and careful consid-

Haydock v. Haydock.

eration, is, that the gifts in question were procured by the exercise of undue influence. I have not adverted to all the evidence which has led me to this conclusion. Usually, in cases of this kind, there are many little things, which, in the abstract, are mere trifles, so small as to be difficult to describe as separate matters, but which, when combined, and considered in the concrete, exercise a very potent influence upon the judgment. There are many such trifles in this case.

Besides, the transactions brought under review belong to a class which it is the habit of courts of equity to examine with a watchful jealousy. A wife may make a valid gift to her husband, but such gifts are not favored in equity, and, if challenged, a court of equity will examine them with an anxious watchfulness and caution and a dread of undue influence, and never sanction them unless they appear to be the free act of the wife. 2 Story's Eq. Jur. § 1396.

The reason is obvious. The husband is master; the wife occupies a position of dependence, and in many cases his superior position enables him to control her will by his wish. The parties here had exchanged their original positions. The wife, in consequence of her husband's weakness, had taken his place, and he had sunk into hers. For this reason, I think, the court is bound, in determining the validity of the gifts in question, to apply the salutary principle just stated, and, unless convinced that they were the free, voluntary, and well-understood acts of the donor's mind, must set them aside. I am not so convinced, and shall, consequently, advise a decree for complainants. The complainants are entitled to costs.