WILLIAM F. BRICK, appellant,

*v.*

JOSEPH M. BRICK, respondent.

1. The opinion of the Ordinary, that the evidence in this case showed that the decedent had testamentary capacity when she executed her will; that she understood its contents; that it was duly and legally executed, and that there was no undue influence on the part of the principal beneficiary, was affirmed.

2. If a will is shown to have been in the testatrix's possession long enough for her to read it, the proponent need not prove that any one saw her read it, or heard it read to her or in her presence. Because if she had the intelligence and capacity to read it herself the law will presume, if the opportunity was afforded her, that she was acquainted with its contents.—*Parker, J.*

On appeal from a decree of the Ordinary, whose opinion is reported in *Brick* v. *Brick, 16 Stew. Eq. 167.*

Appended is the opinion of Hon. Joel Parker, then presiding judge of the Burlington orphans court, and from the decree thereon the appeal to the Ordinary was taken and his opinion rendered *ut supra.*

A paper writing, purporting to be the last will and testament of Rebecca Brick, deceased, has been offered for probate. A *caveat* having been filed, evidence has been taken before the orphans court. The matter has been elaborately argued, and we are now called upon to determine whether probate of the will shall be granted.

The will purports to be dated on the 26th day of January, A. D. 1883, and the testatrix died about three years afterward. It was executed on the day it bears date, in the presence of Samuel Woolman and William J. Brown, two neighbors of the

Brick *v.* Brick.

testatrix, who signed as witnesses. At the time of the execution of the will, the testatrix was not quite seventy-five years of age.

It appears by the testimony that Mrs. Brick was a widow. Her husband, Joseph Brick, had been dead more than seventeen years. At the time of the execution of the will she had six children living, each of whom was over twenty-one years of age.

Joseph M. Brick, one of her sons, who, it seems, had, since her husband's death, advised and assisted her in the transaction of business, was appointed her executor. She devised the farm on which she resided, together with the stock and farming implements thereon, to her son Joseph, and directed that the same should be valued and accounted for by him at the sum of $6,000. After giving specific legacies of some articles of household goods to several of her children, and the sum of $100 to Louisa Wood, an old lady who had lived with her for over fifty years, she directed her executor to sell the residue of her estate and divide the proceeds, together with the $6,000 (the valuation she had fixed on the farm devised to Joseph), equally between her six children. Directing her executor to select some corporation to act as trustee for her son John I. Brick, to receive his share in trust, paying the interest thence arising to said John I. Brick during his natural life, and at his death to divide the principal among his surviving children.

It is clearly proved by the testimony—in fact, it is admitted on the part of the caveators—that the instrument purporting to be her will was executed by the testatrix with all the formalities required by law. She signed the same in the presence of the two subscribing witnesses, who were present at the same time. At the time of signing, she declared, in the presence of both the witnesses, that the instrument she then signed was her last will, and both the witnesses then signed as witnesses to the will in her presence and in the presence of each other.

The evidence also clearly demonstrates that, at the time of the execution of the will, the testatrix was of sound and disposing mind and memory; that she was in the possession of all her faculties, and, up to the time of her death, was a woman of positiveness and decision of character, and possessed of strong

will-power.  Several examples to illustrate this are given in the testimony, which it is unnecessary here to state, because the caveators admit that ·the testatrix was possessed of sufficient mental capacity at the time of the execution of the instrument to make a valid will.

The probate of this will is resisted on two grounds, viz.:

*First.* Because Mrs. Brick did not understand the contents of the instrument which she signed; and

*Secondly.* Because, even if she did understand the contents, the instrument was procured by undue influence on the part of the proponent, Joseph M. Brick.  These alleged reasons for declaring this will invalid will be considered in reverse order.

First, as to the charge of undue influence.  What is the law on this subject?  It has been settled in this state that the influence acquired over a testator by kind treatment, not connected with fraud or coercion, is not undue influence, but that such influence is proper and legal.  Inequality, or even what might be regarded by others as great injustice towards some of the children of a testator in a will, does not prove undue influence.  Because a testator gives more to one child than to another, overvalues or undervalues property devised, undue influence is not thereby shown on the part of the favored devisee, and, in the absence of proof of fraud, will not be presumed.  The influence exercised over a testator which the law regards as undue, must be such as to destroy the free agency of the testator, must amount to fraud, and must be proved by the persons who oppose the probate of the will.

With the above brief statement of the legal signification of the term undue influence, as laid down by numerous authorities, the inquiry arises whether there is proof of undue influence in this case.  Did the mind of Joseph M. Brick, or any other person, dominate and control the mind of the testatrix in the disposition of her property?.

In considering this question, the health and mental condition of Mrs. Brick at the time of signing the instrument are impor- tant factors.  The proof shows that this case differs widely from one where the testator is very aged, and where the mind and

body are enfeebled by disease. In such cases it would not be difficult for a designing person to impose upon, deceive and dominate the will of a testator.

But it is beyond controversy that Mrs. Brick, when she signed the instrument in question, was a woman of sound mind, with an unusually resolute will. All the testimony on the subject shows that at the time of the execution of the will she was in health, with mind unclouded, and physically strong.

There has been a vast amount of evidence taken as to the value of the farm she devised to Joseph. In the will she directed that Joseph should have the farm, the stock and personal property thereon, by paying the sum of $6,000 into the estate, which was equivalent to devising the same to him, subject to a charge of $6,000. Some of the witnesses value the farm much higher than the sum named in the will, and the weight of the testimony is that it was actually worth more. But even if worth double the sum named, that fact would not prove undue influence. There is seldom a will admitted to probate that has perfect equality in its provisions. Indeed, the very object of making a will, generally, is to distinguish somewhat as to the value of the legacies or devises. If Mrs. Rebecca Brick was, at the time of the execution of her will, of sound and disposing mind and memory, if her mind was free to act and was not dominated by the will of another, and if she knew the contents of the instrument that she signed, it was a valid will, and would have been a valid will if she had devised the farm to her son Joseph without charging him with a dollar upon it. The property was hers, and she had a right to do with it as she saw fit. It is true that, where there is any evidence of what the law terms undue influence on the part of a favored legatee, the fact of inequality will add to its weight, but that fact standing alone will not make out a charge of such influence and invalidate a will, even if the whole estate be given to the favored one.

The testimony in relation to the charge of the undue influence on the part of Joseph M. Brick, in substance, amounts to this, i. e., the mother, although a woman of sound mind and decision of character, was unacquainted with the details of busi-

ness; her son Joseph was a business man residing near her; she called on him to collect and receive moneys for her, to deposit the same, and to aid her in investing; when signing or endorsing checks, he showed her, at her request, where to sign her name. Such a course of conduct, under the circumstances, was not unnatural. Indeed, it was what would be expected to occur between a mother having property to look after but unaccustomed to business, and a son engaged in mercantile pursuits, whom she knew to be familiar with business methods. He would have been an unkind son if he had not aided her in the management of her property. When Mrs. Brick determined to make a will, it was not unnatural for her to ask her son, not what the will should contain (for there is no evidence of such request by her or of any suggestion by him in reference to its contents), but how she was to proceed to have a will written in due form and formally executed. She was ignorant of such business and was obliged to inquire of some one, and to whom should she go in preference to the son to whom she had for a long time entrusted her ordinary business affairs?

Under the circumstances proved in this case, the fact of Mrs. Brick's preparing a memorandum for a will, and handing it to Joseph with a request to take it to a lawyer to frame in legal form; the taking of the memorandum by Joseph to Mr. Merritt, a lawyer, from which to draft a will; his receiving it again from Mr. Merritt; his asking the attesting witnesses to attend; his superintending the formal execution of the instrument; his taking the will into his possession after execution, and at her request keeping the fact of its execution secret, do not prove undue influence. At best, these facts amount only to suspicious circumstances, which, taken in connection with direct evidence of undue influence, would add to the weight of such testimony. But there is no direct evidence of undue influence on the part of Joseph over his mother. Nothing but kind offices are proved, and there is no evidence detailing any circumstance showing on the part of Joseph an influence over his mother such as to destroy or interfere with her free agency.

Even if the circumstances of suspicion referred to were suffi-

cient to shift the burthen of proof on the question of undue influence, it is clear from the testimony that neither Joseph M. Brick nor any other person procured the will in controversy by undue influence.

The remaining reason urged by the caveators why this paper should not be admitted to probate as a will is, the allegation that it does not appear that the testatrix knew the contents of the instrument she signed.   It is contended on the part of the caveators that the testimony does not show that she read the will, or that it was read to her, or that she was in any way informed of its contents.   Now, it is not necessary to prove by any witness that he saw Mrs. Brick in the act of reading the will, or that he heard it read to her, or in her presence.   If the facts proved show that she had the paper in her possession a sufficient length of time to read it, it will be presumed she did so.   She was able to read manuscript, having written with her own hand the memorandum from which the will was drafted.   She was in health and in the full enjoyment of all her mental faculties, and being a thoughtful and careful woman, although not versed in business matters, it is not credible that, when she declared the instrument she signed to be her will, she was ignorant of the contents, if she had been in possession of the instrument long enough to read it.   It is not to be presumed that she would have signed the instrument and completed the most solemn act of her life by declaring it to be her last will and testament, if she had not been acquainted with its contents.

She wrote, as before said, the memorandum from which the will was drafted.   In framing the instrument and putting it in legal form and phraseology, Mr. Merritt followed strictly the memorandum of Mrs. Brick.   It is not denied that the will which Mrs. Brick executed was the same that Mr. Merritt had prepared, and if so, it follows that it was the will of Mrs. Brick, and that she knew what it contained.

But aside from this, and on the assumption that the testatrix did not write the memorandum from which the will was drafted, does the evidence sustain the position of the caveators, that Mrs. Brick did not have the instrument in her possession long enough

to inform herself of its contents, after it came from Mr. Merritt and before its execution?

The caveators assume that Joseph M. Brick received the paper from Mr. Merritt on the 26th day of January, 1883; that Joseph kept it in his possession all that day until he went to his mother's residence the same evening with the witnesses, and that it was not out of his possession, so that his mother could have examined it, but that it was executed immediately after he placed it on the table, without her reading it, or its being read in her presence.

But how do we know that Joseph received the paper from Mr. Merritt on the 26th of January, the same day it was signed by the testatrix? The testimony of Mr. Merritt is the only source from which the caveators would have us draw such conclusion. Now, while Mr. Merritt is a very careful and reliable business man, his testimony in this case, given several years after the events referred to in it had happened, is extremely indefinite, especially as to dates. The transaction he was called upon to explain had passed almost entirely from his memory, and he frankly said so in his testimony. When he was first examined he said that the body of the will was in his handwriting, except the date; that Joseph M. Brick brought him the memorandum from which to draft it, and that after he had prepared it he either mailed or handed it to Joseph. Mr. Merritt did not then give any dates, either as to the time of his receiving the memorandum, his preparation of the will, the payment of a fee, or his delivery of the will, either personally or by mailing, to Joseph. At a subsequent day Mr. Merritt was again called and further examined. He could not then remember (after a long time for reflection) whether he mailed the instrument he prepared to Joseph or delivered it to him personally. What he then stated, he said, he wished to be understood as only his impression. As to dates, he testified that since his first examination he had looked in his cash book, and found by an entry in the same that on the 24th day of January, 1883, he had received a fee from Joseph M. Brick, but he did not know for what service that fee was paid, as the book did not state what it was for. He was doing other busi-

Brick *v.* Brick.

ness for Joseph about that time.   His cash-book showed another fee paid him by Joseph, but as the fee received on the 24th of January was nearer the date of the will than any other, it was argued that it was the fee paid for drawing the will, and Mr. Merritt stated that as his impression, and he added that it was but a faint impression, arising only from the proximity of dates, and was not a distinct recollection.   From this faint impression it is assumed by the caveators that the will was drawn by Mr. Merritt on the 24th of January; was sent to Joseph on the 25th, and received by him on the 26th; that Joseph took it to his mother to be executed the same evening he received it, and that, therefore, it is said that the testatrix had no opportunity to read it before it was signed.

It is assumed by the caveators, in the first place, that the fee paid to Mr. Merritt on the 24th day of January was the fee paid for drawing the will, and it is further assumed by them that the will was prepared by Mr. Merritt on the same day that the fee was received.   This is mere assumption, for there is no proof of it.   Mr. Merritt nowhere states whether he received a fee for drawing the will before the day he wrote it, or on that day, or after he had written and sent it to Joseph. He could not state anything definitely on that subject, for he had no recollection concerning it.   It may have been forwarded to Joseph several days before the fee for writing it was paid. Is it not as reasonable, indeed more reasonable, to suppose that the fee was paid to the lawyer after the work was done than in advance of the work?   If such was the fact, and there is nothing in the testimony antagonistic to it, then the draft of the will was received by Joseph from Mr. Merritt before the 24th of January, and he had time to deliver it to his mother several days before she signed it.   And this is what Joseph M. Brick swears he did.   He says he took it to her and left it with her for two or three days, perhaps a week, before the date of its execution.   On his first examination, Joseph said he thought two or three days passed after he received the will from Mr. Merritt before it was executed by his mother.   He also said that when he received it he took it to her the first opportunity, and he

thinks he went down there the same evening, but is not positive of that.  He also says that the next time he saw the will after he had left it with his mother was when he saw it lying on the table, at his mother's house, the evening it was executed.  Upon cross-examination he said that when he delivered the will to his mother she laid it on the table and said she would get her spectacles. On being asked, in another part of his examination, if he remembered how long it was after he received the will and delivered it to his mother before it was executed, he answered that he thought it was about a week, somewhere along there, as near as he could recollect, but could not exactly give the time.

If Joseph M. Brick did not commit the crime of perjury when examined as a witness in this case (and we have no reason, from the testimony, to conclude that he did), the testatrix had the instrument of writing which Mr. Merritt prepared, and which she executed on the 26th day of January, 1886, as her will, in her possession several days before she signed it.  She therefore had opportunity to read it and to know what were its contents, and what she was signing when she executed it.

Having ample opportunity to read and examine it, the presumption is that she did so.  All the testimony in reference to the mental organization and habits of life of Mrs. Brick lead to the conclusion that while she was not conversant with ordinary business, she would not have performed so solemn an act as the execution of her will without being informed of the contents.

The testatrix being of sound mind at the time of the execution of the paper writing offered for probate as her will, it appearing that she was not subjected to what in law is deemed undue influence by any one, that she had knowledge of the contents of the writing when she signed it, and that it was executed with all the formalities required by law, we have concluded to admit it to probate as the last will and testament of Rebecca Brick, deceased, and we do so order.

*Mr. Mark R. Sooy,* for appellant.

*Mr. Jos. H. Gaskill,* for respondent.

PER CURIAM.

This decree unanimously affirmed for the reasons given by the Ordinary.