Susan B. Sullivan, unmarried, late of the city and county of Passaic, died on December 5th, 1937. She was approximately eighty years of age. Surviving her are her brother, William M. Sullivan, Sr., and nieces and nephews as follows: J. Edwin Sullivan, William M. Sullivan, Jr., and John J. Sullivan, children of the said William M. Sullivan, Sr.; Arthur J. Sullivan, Frank L. Sullivan, Adrian D. Sullivan, Jr., Lucia S. Smith (nee
Sullivan), and J. Matthew Sullivan, children of a deceased brother, Adrian Sullivan; Mary S. Bragaw (nee Sullivan), Ruth S. Asensio (nee Sullivan), John Francis Sullivan, children of a deceased sister, Ella C. Sullivan (she having been married to a man of her own surname *Page 183 
"Sullivan"); John Paul Sullivan and Mary J. Sullivan, children of a deceased brother, Daniel W. Sullivan. The testatrix had had the following brothers and sisters who had died without issue: James A. Sullivan, John J. Sullivan, Mayte Sullivan, Elizabeth Sullivan (known as Libby).
On January 24th, 1938, the Passaic National Bank and Trust Company filed in the office of the surrogate of Passaic county a writing dated March 22d 1937, purporting to be the last will and testament of the said Susan B. Sullivan. A caveat against the probate of any will purporting to be hers, was filed December 16th, 1937, by the said William M. Sullivan, Sr. Later, on February 9th, 1938, the said William M. Sullivan, Sr., filed in this court a paper-writing dated January 19th, 1934, purporting to be the will of the said Susan B. Sullivan. On February 9th, 1938, this court signed an order removing the probate proceedings then pending in the orphans court of Passaic county, and consolidated them with the proceedings instituted herein by the said William M. Sullivan, Sr., for the probate of the paper-writing dated January 9th, 1934. Hearings were had on the disputed documents on March 21st, 1938, June 7th, 1938, June 9th, 1938, November 2d 1938, December 12th, 1938, and December 13th, 1938. The record in the case is voluminous. Briefs on the points involved were submitted by counsel since the conclusion of the hearings, the last of which was filed herein as late as June 17th, 1939. The briefs go into considerable detail and are extensive.
The issue appears to be: (1) Was the will of March 22d 1937, a product of coercion, misrepresentation and undue influence on the part of Arthur J. Sullivan, a nephew of the decedent, the draftsman of the will; and (2) did it represent the actual desires of the testatrix?
Elizabeth and Mayte Sullivan, sisters of the testatrix, were unmarried. They and the testatrix lived together in the family home at 43 Passaic avenue, Passaic, New Jersey. That property had been owned by the deceased brother, Dr. John J. Sullivan, until 1919. The sister, Mayte, died intestate, in 1929, and her estate, which amounted to approximately $60,000, was distributed to her next of kin then living, to wit, *Page 184 
William M. Sullivan, Sr., Susan B. Sullivan, and Elizabeth Sullivan, c. Upon the death of Mayte, Susan and Elizabeth continued to live together until the death of Elizabeth in 1935. Elizabeth and Susan sometime during the year 1929 executed testaments prepared for them by Henry C. Whitehead, a member of the bar of this state. The wills were reciprocal in nature; after certain minor bequests, the residue of the estate went to the sister who survived, and to the brother, William M. Sullivan, Sr., in equal shares. The wills also provided that if the brother should die before the testatrix, then the one-half share of the rest, residue and remainder allotted to him, should go to his then living children.
In January, 1934, the two sisters, Elizabeth and Susan, consulted their counsel, Mr. Whitehead, about a modification of their respective wills. It resulted in new testaments being drawn for them which, in effect, provided that each sister bequeathed and devised her entire estate to the other. The wills further provided that in the event of the death of one testatrix before that of the other testatrix, then the interest of the surviving testatrix in 43 Passaic avenue, upon her death, should go to the nephew, William M. Sullivan, Jr., the son of William M. Sullivan, Sr.; and that $300 should be paid to each of the nieces and nephews, except the nephew, William M. Sullivan, Jr.; and that the residue should go to the brother, William M. Sullivan, Sr. Elizabeth died on September 19th, 1935, and her will was duly probated in the office of the surrogate of the county of Pasasic. These facts are detailed because of the probable effect they may have in determining the conduct, or policy, of the testatrix.Rusling v. Rusling, 36 N.J. Eq. 603.
The will of March 22d 1937, calls for a division of the estate into four parts, one of which goes to the brother, William M. Sullivan, Sr., and in the event of his death, to his children,c.; one part to the nieces and nephews, children of the deceased brother, Adrian D. Sullivan, and to the issue of such of them,c.; one part to the nieces and nephews, children of the deceased brother, Daniel W. Sullivan, and to the issue of such children,c.; one part to the nieces and nephews, children of the deceased sister, Ella F. Sullivan, *Page 185 
and to the issue of such children, c. The executor named under this will is the Passaic National Bank and Trust Company.
This March 22d 1937, will, in effect, distributes the estate in the same manner as that which is provided for by law in the event of intestacy; except that survivorship is provided for beyond brother's and sister's children. R.S. 3:5-4. It was drawn by the said Arthur J. Sullivan, a member of the bar of this state. His testimony as to the preparation and execution of the will, to a great extent, covers numerous visits of the testatrix to his office from December, 1936, to March, 1937. In part, it is as follows (page 249, testimony):
"Q. Now, on this 23d day of February, or thereabouts, did she come to see you, or did you go to see her? A. She came into my office, and as soon as she got into my private office, she closed the door and she came over and sat down and said, `Arthur, will you do something for me?' I said, `Yes, best aunt, if I can. What is it?' She said, `will you make a will for me?' and I said, `yes, if you want me to.' I said, `have you decided how you want to dispose of your property?' She said, `I have been thinking it over, and I want to talk to you about it.' I said, `well, how do you want to dispose of it?' She said, `I want to leave it equally among the family.' I said, `equally among the family?' and she said, `yes, I want everybody to share in the estate.' I said, `all right, if that's the way you want it, and what do you want to do about the executor?' She said, `now, what do you think?' I said, `considering the fact there are so many members in the Sullivan family, if I were in your place I would recommend a disinterested party or corporation so they would have no interest in the case, and I think it would work out better in that way.' We discussed it for awhile, and she said `what do you think?' I said, `why not the Passaic National? They have a big trust department, and they handle a good many of these affairs, and I think it would be a good idea to put them in.' She said, `all right, I will think it over and will let you know.'"
The witness said that three or four days later (page 431):
"A. She came in again and she said, `I have been thinking *Page 186 
about my will,' and I said, `have you finally made up your mind?' and she said, `well, I have been thinking about Eddie.' I said, `is that so?' and she said, `yes.' She said, `do you think I ought to leave Eddie' [son of William Sullivan, the surviving brother] `something, because he has been good to me.' I said, `I know he has.' She said, `he has been good to me and taken me out riding.' I said, `yes, you can leave him something.' She said, `how can I do it?' I said, `you can leave him a cash legacy. The only thing you have to do is to determine how much you want to leave him, and we will then put it in that way.' She said, `all right, I will think it over,' and she went out again."
He then said that "the very first part of March:"
"A. She came in again and said, `Dearie, I have been thinking about my will again.' I said, `Have you made up your mind?' `Well,' she said, `I have been thinking about John J.' [son of William M. Sullivan, the surviving brother]. I said, `all right, what about him?' She said, `he has been good to me, and do you think I can leave him a little something?' I said, `how much do you want to leave him?' She said she didn't want to leave him much as she thought she would leave Eddie. I said, `have you made up your mind how much you want to leave Eddie?' She said, `I thought about five thousand. What do you think of that?' I said, `It is perfectly all right.' Then she said, `I thought I would leave John J. about a thousand.' I said, `that's all right.' Then she said, `I will think it over. I think that is what I want to do.' So then she went out again."
He said that a few days later she again came in and (page 433, testimony):
"Well, she came in again and she said, `I have been thinking it over and I have finally decided I will leave it like in the first place.' I said, `what do you mean?' She said, `just leave it share and share alike in the family.' So I said, `have you finally decided that is the way you want your will drawn up?' and she said, `yes,' and I said, `I will draw it up that way, and is it still all right that the bank is executor?' and she said, `all right.' And I said, `all right, I will draw it *Page 187 
that way, and she said, `I will be back in a couple of days to sign it.'"
Arthur further testified that on March 17th, 1937 (page 438, testimony):
"A. She came in this day and she said, `is the will ready?' and I said, `yes.' She said, `I have been thinking about it, and I think it would be better for me to die without a will like Aunt Mayte did.' I said, `in some ways I think it probably would, but how can you?' She said, `what do you mean?' I said, `my understanding is in 1934, when Aunt Libby made her will, you made a will at the same time.' She said, `yes, I did.' She said, `if you have that will and you destroy it, then I would die without a will,' and I said `have you got it?' She said, `oh, no, I haven't got it.' I said, `well, who has it?' She said, `William has it.' I said, `you can get it back from William, and you can destroy it.' She said, `I wouldn't speak to him at all. I don't want him to know what I am doing.' I said, `if that is so, you can't die without a will, because if anything happened to you that will would be brought out.' She said, `oh, I don't want that.' `Well, then,' I said, `the only thing for you to do is to sign the new will.' So I sent for Miss Cagle and she came in and brought in the will which was in the safe, and so I read the will to best aunt. Q. At that time was there any one present than you and best aunt? A. No. Q. Just you and she? A. Yes. Q. What was the result of that? A. So I read the will to her and said, `Is that the way you want it?' and she said, `yes.' I said, `what do you want to do about signing it?' I said, `I think it would be better as long as the bank is executor, that you sign the will downstairs.' She said, `I won't do it now. I will be back in a couple of days and sign it.' I said, `you can sign it anytime you want to,' and I gave the will to Miss Cagle and she put it back in the safe."
He states (page 440) that she was in his office for a few seconds on March 19th, and:
"She came into my private office and closed the door behind her and she came over to my desk and she said, `I have no time now. I am in a hurry. I will be in in a couple of days. Is everything ready?' and I said, `yes.' So she went out the *Page 188 
side door, the door that leads from my private office into the hall. I don't suppose she was there more than a couple of minutes."
He then says that on March 22d 1937 (page 440):
"A. She came in and she said, `I am ready.' I said, `all right, I will call the bank that you are ready to sign the will.' So I called the bank and got Mr. Lindstammer on the 'phone and I said, `best aunt is here, and she is ready to sign the will, and I would like to bring her down and have her sign it down there.' He said, `all right, I will send the elevator up for you.' So I called Miss Cagle in and she gave me the will, and I took the best aunt out the same side door of my office leading to the hall, and the elevator is right opposite the door to my office. So we got into the elevator and I took her down to the trust department of the bank, which is on the second floor, and took her into the office, where there were a couple of stenographers and Mr. Rhyne sitting in the main office. So Mr. Lindstammer came to the door of his private office to where we were, and I said, `Gene, this is my aunt, Susan B. Sullivan, and here is her will, and she wants to execute it.' So he spoke to Rhyne, and Rhyne got up and he introduced best aunt to Rhyne, and the three went into his office. Q. Did you go into the private office of Mr. Lindstammer with best aunt? A. No. Q. Were you present when the will was actually signed? A. No. I remained in the outside office talking to one of the stenographers."
And (at page 441) he said:
"Q. And when they came out again, was there any conversation between best aunt and you, or Mr. Lindstammer, in her presence? A. Mr. Lindstammer went to the door of the public office, and he said, `all right, Art, it is signed — do you want to come in? So I went in, and best aunt was sitting at the table and Lindstammer was seated, and Rhyne went out of his office and went out to his desk, and Gene said, `well, now, Miss Sullivan, what do you want to do with the will?' He said, `we have a depository here for safe keeping, and if you want to keep your will here, we will be very glad to take care of it for you.' Best aunt turned to me and said, `what do you think, dear?' I said, `if I were you, inasmuch as the *Page 189 
bank is the executor, I would let the will here.' So, she said, `all right.' And so Mr. Lindstammer took the will and we got up and best aunt put her arms around my shoulders and said to Mr. Lindstammer, `here is my favorite nephew, and he takes good care of me,' and we went out."
The objectors to the probate of the will of March 22d 1937, produced witnesses who had been employed in the office of Arthur Sullivan at the time the will was executed. One of them, Victoria Fetko, gave testimony to the effect that she remembered the testatrix appearing in Arthur's office in March, 1937; that on the first occasion, a Wednesday morning, she walked into Mr. Sullivan's office, "and I imagine she was in there about fifteen or twenty minutes and came out again." The second time she appeared was on the Friday "she again came in and went into Arthur's room. I don't know what went on. The door was closed. I did hear voices, but I couldn't distinguish anything that was said. She came out about one o'clock, or two — I can't recall. It wasn't later, and she appeared visibly upset. She seemed to be mumbling to herself. Her head was bent and she shuffled out of the room." (Testimony, page 192.)
John J. Sullivan, son of Dr. William M. Sullivan, Sr., a lawyer, who had formerly clerked in the office of Arthur, testified that on March 17th, 1937, the testatrix appeared at Arthur's office, and that (page 112, testimony):
"I was very much surprised when she [testatrix] turned and walked across the street. The next thing I knew she came into the office. I was waiting out in the waiting room and I said hello to her, and she mumbled something, but went right into Arthur's office, and I heard him say, `hello, best aunt.' I went over to the water cooler to get a drink of water, and I heard Arthur talking, and his speech grew louder as he talked, and he said something about it wasn't fair that Harrison street should hem her in. I heard him mention Eddie's name and William's to the effect that something or other was a pack of lies. Then he came over to the door and closed it. Whether he saw me, I don't know. He came over and closed the door. They stayed right there in the inner office. Although I couldn't hear any more, the *Page 190 
shouting continued for about ten or fifteen minutes. Every now and then I could hear a loud voice spoken. At the end of that time my aunt came out, and I walked over to say something to her, but her head was down and she was muttering to herself and shaking, and she went out."
I find nothing in the evidence of Victoria Fetko and John J. Sullivan as to the visits of the testatrix to the office of Arthur Sullivan, which indicates an attempt on the part of Arthur to influence the testatrix in making her will.
The evidence shows that the testatrix was in good physical health until she was stricken a few days before her death. She had been able to attend to her business affairs, her household tasks, and to go about town on shopping tours. The objectors claim that beginning March or April, 1937, the testatrix began to decline physically; that prior to March, 1937, it had been her custom to walk to church, but after that time she was conveyed back and forth; that her walks were short and her gait shuffling; and her breath seemed to grow "short." However, the disabilities alleged were not of an aggravated character. In June, 1937, she visited her niece at New London, Connecticut, where she remained for five or six weeks. While there she walked a distance of five or six blocks to the beach, with one of her niece's children. She would remain at the beach for several hours and then walk back. In August of the same year, she visited the home of her nephew Arthur in Sussex county, where she spent a week-end. Shortly after her visit to Arthur's home, she visited the home of her brother, Dr. William M. Sullivan, in Victory Mills, in the State of New York.
The evidence is convincing that up to the time of her final illness in December, 1937, she had been active and in sound health, both in mind and body.
The objectors to the March 22d 1937, will submitted testimony of conversations on the part of the testatrix in which she expressed her deep interest in and affection for, them. They also recited instances in which she criticised the conduct of the proponents of the 1937 will. But in that evidence, or in any of the testimony offered, I can find nothing which *Page 191 
indicates that the testatrix was unduly influenced by the proponents in making and executing the 1937 will.
In Rusling v. Rusling, supra, the court said (at p. 607):
"When undue influence is set up in impeachment of a will, the ground of invalidity to be established is that the conduct of others has so operated upon the testator's mind as to constrain him to execute an instrument to which, of his free will, he would not have assented. This involves two things: first, the conduct of those by whom the influence is said to have been exerted; second, the mental state of the testator, as produced by such conduct, which may require a disclosure of the strength of mind of the decedent and his testamentary purposes, both immediately before the conduct complained of, and while subjected to its influence. In order to show the testator's mental state at any given time, his declarations at that time are competent, because the conditions of the mind are revealed to us only by its external manifestations, of which speech is one. Likewise, the state of the mind at one time is competent evidence of its state at other times not too remote, because mental conditions have some degree of permanency. Hence, in an inquiry respecting the testator's state of mind, before or pending the exertion of the alleged influence, his words, as well as his other behavior, may be shown for the purpose of bringing into view the mental condition which produced them, and through that, the antecedent and subsequent conditions. To this extent his declarations have legal value. But for the purpose of proving matters not related to his existing mental state, the assertions of the testator are mere hearsay." In re Tobin, 111 N.J. Eq. 592;163 Atl. Rep. 128.
In a conversation which occurred in 1929, after the death of the testatrix' sister, Mayte, which was participated in by Mary Bragaw, a niece, Ella Sullivan, and Elizabeth Sullivan (Aunt Lib), and the testatrix, concerning Mayte's intestacy, the testatrix and Aunt Lib said that it was their desire that the family money should go to the different members of the family in equal parts. (Testimony, pages 363, 380.)
The approximate value of the testatrix estate is $100,000. Under the will of March 22d 1937, $25,000 of it goes to *Page 192 
Arthur's family. Arthur's share would be, approximately, $5,000. If the testatrix died intestate, Arthur's family would benefit to the same extent as the 1937 will now provides for them, and Arthur would then receive what the testament, if valid, will vest in him.
The objectors to the 1937 will charge that there was a relationship of trust and confidence between Arthur and his aunt, and under the circumstances, they contend he cannot benefit, directly or indirectly, under the terms of the 1937 will.
The evidence of the so-called trust relationship between Arthur and the testatrix concerns the interest of the testatrix in the Sullivan Realty and Investment Company which had been under the management of Arthur since 1931. It is purely a family concern. As manager of that company, Arthur was, and is, required to transmit to the different interested members of the family the income received by the company from the company's properties. Immediately upon its receipt by him, he disbursed it in checks to the different members of the family who were entitled to them. He, as manager, paid the expenses incident to the property such as taxes, maintenance, c. I cannot, and do not find, that Arthur's employment by the company established a personal relationship, that of trust and confidence, between him and the testatrix.
There was considerable testimony about an incident that took place on March 17th, 1937, between Arthur and the testatrix, in which it is alleged by the objectors, Arthur stated to her that she was "being hemmed in by Harrison street," meaning thereby the family of Dr. William M. Sullivan, Sr. (Page 112, testimony.) They declared that in consequence of that statement by Arthur that the testatrix became agitated and distressed. They further charged that she said Arthur had said mean things about her and had called her nephew Edwin, for whom allegedly she had great affection, bad names and referred to him as a "damn liar." Arthur is alleged to have said to her that she had no right to make a will; that Mayte had left no will; and that her money had been derived from Dr. John Sullivan. (Page 146, testimony.)
Arthur admitted he had said to the testatrix that Edwin *Page 193 
was a "damn liar," when testatrix visited him about February 10th, 1937, and told him that Edwin had stated to her he had been informed that "she had no money and that everything was gone." Arthur then informed the testatrix that Edwin had not stated the truth; that her estate was large, and that she was possessed of ample means. (Testimony, pages 421, 422.) He denied that he at any time spoke harshly to the testatrix, or spoke to her in such a fashion as to cause her any agitation or distress.
It seems hardly credible that she would continue to visit Arthur's office if she were subjected to the kind of treatment which the objectors allege she received at the hands of Arthur, and her visits there were alone and frequent from December, 1936, to and including the month of the March following: If she were dissatisfied with Arthur's conduct towards her, she could have ceased her visits to his office. She was not obliged to consult him about the preparation of her will.
On February 23d 1937, she visited Arthur's office and there asked him to draw a will for her (page 430, testimony). Several days later, she again called at his office about the same matter (page 431, testimony). Early in March she visited Arthur's office about her will (page 431, testimony). Some days later she conferred with him about it (page 432, testimony). On March 9th, 1937, she called at the office and inquired if the will had been drawn, and also, then received a check in her favor from the company aforesaid for the sum of $200, which was brought to the bank and cashed by an employe of Arthur's (page 436, testimony). On March 10th, 1937, she again visited Arthur's office. She did the same on March 17th, 1937; she told Arthur that her 1934 will was in the possession of William M. Sullivan. He advised her to procure it and destroy it. She said she did not want William M. Sullivan to know what she purposed doing; to which Arthur replied: "Then the only thing to do was to execute a new will." (Page 439, testimony.) A draft of the will was then prepared and read to her and she expressed satisfaction with it.
On March 19th, 1937, she called at Arthur's office and stated she would return in a few days to sign the will. On *Page 194 
March 22d 1937, she returned and said she was ready to sign it. Arthur accompanied her to the bank located in the same building, and there met the bank official, Lindstammer, and his assistant, Rhyne, the witnesses to the will. She then and there executed it. Arthur was not present in the room while it was being executed.
The will appears to have been properly executed and attested. The witnesses to it are disinterested and impartial. They were closely interrogated as to its execution and gave convincing evidence of its legal execution.
The attestation clause annexed to a will, and signed by the witnesses, is prima facie evidence of the facts stated in it. It can be overcome only by affirmative proof to the contrary.Allaire v. Allaire, 37 N.J. Law 312; affirmed,39 N.J. Law 113; In re Johnson, 115 N.J. Eq. 249; 171 Atl. Rep. 307; In reWilson, 107 N.J. Eq. 604; 153 Atl. Rep. 107; Waddington v.Buzby, 45 N.J. Eq. 13; 16 Atl. Rep. 690; Brick v. Brick,44 N.J. Eq. 282; 18 Atl. Rep. 58.
The testatrix never confided to the other members of the family that she was making a new will. She evidently had reasons for keeping it secret. Certainly, there was no obligation on the part of the draftsman to make known to anyone the fact that he had prepared a will for the testatrix. It would have been a breach of professional ethics for him to have done so. It was her business and it chiefly concerned her. If she wanted the knowledge broadcasted among her relations, she undoubtedly would have so indicated. However, it was her privilege to withhold or give out the information; she did not choose to discuss it — even to the objectors who claim to have had her confidence.
When the will was executed, the testatrix left it in the custody of the bank she had named as her executor. It was available to her at all times. If she wished to obtain it for modification or otherwise, she undoubtedly could have procured it without the slightest difficulty.
In In re Young, 90 N.J. Eq. 236; 106 Atl. Rep. 425, appears:
"A woman competent to make a will has a right to the aid of any person she may think proper to select, when she desires *Page 195 
to put her testamentary wishes in form to have legal sufficiency, and if she exercises this right without improper interference or control, though she selects a person she intends to make one of her beneficiaries, that fact, in the absence of evidence showing an abuse of confidence, constitutes no reason why probate should be denied to her will."
In Haydock's Ex'rs v. Haydock, 33 N.J. Eq. 494, is the following:
"Whatever destroys free agency, and constrains a person to do what is against his will, and what he would not do if left to himself, is undue influence, whether the control be exercised by physical force, threats, importunity or any other species of mental or physical coercion.
"Undue influence is not measured by degree or extent, but by its effect; if it is sufficient to destroy free agency, it is undue, even if it is slight." Dumont v. Dumont, 46 N.J. Eq. 223; 19 Atl. Rep. 467.
Under all the facts and circumstances, I feel that the instrument dated March 22d 1937, is the last will and testament of the testatrix, the decedent, Susan B. Sullivan. I shall advise an order to this effect. *Page 196