OF

## THE STATE OF NEW JERSEY.

### OCTOBER TERM, 1908.

---

MAHLON PITNEY, ORDINARY.

EDWIN ROBERT WALKER, VICE-ORDINARY.

---

In the matter of the probate of the will of ESTHER J. COOPER, deceased.

[Decided January 2d, 1909.]

1. An attorney, who had been the legal adviser of testatrix for some years, prepared her will and codicil, whereby he was appointed executor and received a specific legacy, and a large share of the estate as residuary legatee. His son also was given a specific legacy by the will. The attorney also procured the witnesses to the will and codicil, and both were executed under his personal supervision.—*Held*, that there was a presumption of undue influence on his part, and the burden of proof that the will was the free act of testatrix was on him.

2. In transactions *inter vivos* the presumption of undue influence is raised solely because of the dependent confidential relation existing between donor and donee; and the donee, to establish the gift, must show that independent advice was relied on by the donor.

12 (177)

3. Where, in a testamentary transaction, the facts show the existence of a confidential relation between testatrix and a beneficiary, slight circumstances in addition to such relation will throw on the beneficiary the burden of showing that testatrix's mind was not unduly influenced.

4. In proceedings to probate a will and codicil, contested on the ground of undue influence, letters written by testatrix after the making of the will, and before and after the making of the codicil, are admissible as bearing on the mental condition of testatrix, but are not competent evidence of the facts stated in the letters.

5. In proceedings to probate a will, contested on the ground of undue influence, evidence of the physical and mental condition of testatrix, of the reasonableness of the gifts made by the will as compared with a prior will, of her knowledge and appreciation of the testamentary disposition made, *held* to show absence of undue influence by the principal beneficiary occupying the confidential relation of attorney.

6. In a proper case, part of a will may be set aside because of undue influence.

7. Where it is impossible to determine to what extent specific legacies have been tainted by undue influence, the whole will, if at all, must be set aside on the ground of undue influence.

8. The fact that testatrix was in possession of her will and codicil for a year and a half with opportunity during that time to cancel the same, is a strong indication that she was aware of their contents.

9. Where a testatrix, after the execution of a will, drawn according to instructions given one who conveyed them to the draftsman, has the executed will in her possession a sufficient length of time, and opportunity and ability to acquaint herself with its contents, and she preserves it, it will be conclusively presumed that the will was prepared according to her instructions, especially when it followed her pronounced intentions, and provided for no unnatural disposition of her estate.

10. The fact that testatrix executed a codicil, which in express terms confirms the will, but which makes changes therein, tends to prove that testatrix was acquainted with the will.

11. Declarations of testatrix that she had made a will and remembered certain persons, and that she had thought a good deal about making the will, and that some people would not be satisfied, were admissible to show that she was aware of the contents of the will, contested on the ground of undue influence.

12. Where the evidence showed that testatrix had fixed testamentary ideas as to the disposition of her estate, and gave instructions to the attorney who drew the will, and that he followed the instructions, there was evidence that she exercised independent judgment essential to sustain the will containing a gift to the attorney.

13. The rule requiring a person disposing of his property by will to exercise a judgment independent of the confidence induced by his confidential relationship with his legal adviser only requires that testator exercise his independent judgment, and does not require proof of proper independent advice.

14. The testimony of a legatee, charged with having obtained the will by undue influence, cannot be arbitrarily disregarded, where such testimony is not contradicted by other credible testimony or discredited by its improbability.

15. Every person competent to make a will has a right to the aid of any person he may think proper to select, when he desires to put his testamentary wishes in legal form; and, if he exercises this right without improper influence, though he selects the person he intends to make his beneficiary, that fact, in the absence of evidence showing an abuse of confidence, is no reason why probate should·be denied to the will.

16. The contention that an attorney who sustained toward one the confidential relation of legal adviser should refuse to accept his testamentary bounty is one of professional ethics, and is not involved in proceedings to probate the will, making such attorney the principal beneficiary and executor.

---

On appeal from a decree of the Morris county orphans court, admitting to probate certain paper-writings purporting to be the last will and testament of Esther J. Cooper, deceased.

The following is the opinion delivered by Judge Mills in the orphans court:

MILLS, J.

This is a proceeding brought to test the validity of certain paper-writings purporting to be the last will and testament of Esther J. Cooper.

The will is dated May 26th, 1900.

The codicil accompanying the same is dated March 29th, 1904. A copy of each has been annexed to these conclusions.

Testatrix was eighty-six years of age at the time of her death, which occurred on October 29th, 1906.

She was the widow of James J. Cooper, who died about thirty years ago.

The validity of the will has been challenged by Carrie L. G. Harrison, the caveator, who is a grandniece of testatrix. Ten other persons, grandnieces and grandnephews, have joined with her in protesting against the probate of the will. The attack is made on the ground that the will with its codicil is the product of undue ·influence exerted upon the testatrix by Charles F. Axtell, an attorney and counselor at law of this state.

Both the will and codicil appear to have been properly executed.

The attestation clauses are in proper form and all the formalities were duly observed at the time each paper was executed.

It is not contended that the testatrix was mentally incapable of making a will, but that, owing to her advanced age, her mind was unable to resist the improper influence exerted by her friend and attorney, Charles F. Axtell.

She was about eighty years of age in 1900.

Axtell had been her sole legal adviser since January, 1898, and had acted for her in some matters before that time, beginning at least as early as 1888. He had known her well for many years, and intimately since 1883.

She appears to have had great confidence in his judgment and integrity.

He claims that, acting under instructions from her, he prepared the rough draft of the will executed in 1900 and that of the codicil executed in 1904.

Each draft was copied by hand and prepared for execution by a young man named Griffith, who was employed by Axtell in a clerical capacity in 1900 and specially employed for the express purpose of copying the draft of the codicil in 1904.

·Under the will of 1900 Axtell receives a specific legacy of $500, and is the sole beneficiary under the clause disposing of the entire residue of the estate of testatrix receiving thereunder a large part of the whole estate, nearly two-thirds thereof.

His son, Roland P., receives a legacy of $250.

In addition, Axtell is the sole executor named in the will, Joseph H. Van Doren having been added as an executor under the codicil of 1904.

Axtell also procured the witnesses to both the will and codicil and each document was executed under his personal advice and supervision.

Under this statement of facts it is clear that the legal presumption of undue influence has been raised and that the burden of proving that the will is the spontaneous act of the decedent was thrown upon Axtell, her attorney and confidential adviser.

In so holding, I do not contend that the presumption of undue

influence has been raised *solely* because of the confidential relation existing between Mrs. Cooper and her legal adviser.

I fully realize that the strict rules that control in the case of transactions *inter vivos* are not applied to those of a testamentary character.

In transactions *inter vivos* the law is so jealous of the rights of the donor that the presumption of undue influence is at once raised solely because of the dependent confidential relation, and when once raised is very difficult to overcome, because of the rule (never applicable in testamentary cases) requiring that independent advice must be shown.

For example, had Mrs. Cooper made Axtell her beneficiary by voluntary irrevocable deed of conveyance instead of by will, the presumption of undue influence would have been at once raised *solely* because of the confidential relation existing between them and the burden would at once have been placed upon Axtell of overcoming that presumption by showing that she had the benefit of "proper independent advice." See *Post* v. *Hagan (Court of Errors and Appeals, March 4th, 1907), 71 N. J. Eq. (1 Buch.) 234; Slack* v. *Rees, 66 N. J. Eq. (21 Dick.) 447.*

In a testamentary transaction, however, like the one now before me the facts showing the confidential relationship must be accompanied by other circumstances in order to raise the presumption of undue influence.

In *Sparks Case, 63 N. J. Eq. (18 Dick.) 242,* it was held by the prerogative court that "the confidential relation existing between a testator and his spiritual as well as secular adviser, who was made residuary legatee, is not alone sufficient to raise a presumption of undue influence; *the rule which raises such a presumption in transactions inter vivos does not apply to testamentary gifts.*

"Slight circumstances in addition to such relation will throw upon the beneficiary the burden of showing that the testator's mind was not unduly influenced." See, also, *Wheeler* v. *Whipple, 44 N. J. Eq. (17 Stew.) 141, 145.*

The "slight circumstances in addition" called for under the *Sparks Case,* are sufficiently shown in Axtell's action in attending to the preparation of the will and codicil, in drafting the re-

siduary clause of the will in his own favor and in selecting the witnesses.

In *Farnum* v. *Boyd, 56 N. J. Eq. (11 Dick.) 766*, it was held that "a lawyer, employed by a testatrix with unsettled testamentary notions as to the disposition of her entire estate, to draw her will, can participate in her bounty, in a material degree, only after a very clear exhibition that his conduct was fair and unobjectionable, and that the testatrix exercised, with relation to her bounty to him, a judgment independent of the confidence induced by his confidential relationship to her."

There is no question but that under the law as applied to the facts in this case, Axtell must overcome the presumption of undue influence before he can benefit by the will of testatrix.

The circumstances surrounding the execution of her will and codicil have made necessary the rigid and exhaustive investigation which has been made in this case.

To relieve himself of the burden of showing that the will in question with its accompanying codicil resulted from the free and unconstrained action of the testatrix without any moral or physical coercion on his part, Axtell has placed a large number of witnesses on the stand and has introduced considerable documentary evidence.

It is for this court to determine whether he has sustained the burden which has been thrust upon him.

In my opinion he has done so. The reason for my conclusions I will give at length, but before discussing them I will briefly consider the law controlling the admission in evidence of statements and declarations made by the decedent.

Great light has been thrown upon the mental attitude of testatrix toward her surroundings by the witnesses, who have testified to many declarations made by her with regard to her relatives and friends.

A large number of letters written by her have also been introduced in evidence. They were almost all written after the making of the will and both before and after the making of the codicil.

Counsel for the contestants strongly opposed the introduction of this kind of evidence.

Its competency cannot be questioned.

In *Marx* v. *McGlynn, 88 N. Y. 374,* Justice Earl held that diaries kept and letters written by a testator, either before or after the execution of the will, while proper evidence, *as bearing upon the mental capacity and the condition of mind of the testator,* with reference to the object of his bounty, are not competent evidence of the facts stated in them, or to prove fraud or undue influence.

The court said: "They are in the nature of hearsay evidence, declarations of the deceased, which are incompetent for the purpose of defeating or destroying the will or any of its provisions. They are competent only as bearing upon the condition of the mind of the testator at the time of the execution of the will. Such memoranda or declarations, *whether made before or after* the execution of the will, are competent as bearing upon the testator's mental capacity.

"They are also competent *as bearing upon the condition of the testator's mind with reference to the objects of his bounty.*

"They may be given in evidence for the purpose of showing *his relations to the people around him, and to the persons named in the will as beneficiaries.* They are, however, entitled to no weight in proving external acts, either of fraud or undue influence."

This interpretation of the law is viewed with approval in *Hobson* v. *Moorman, 3 L. R. A. (N. S.) 749; 90 S. W. Rep. 152 (Tennessee Supreme Court, December, 1905),* a case in which the question of the effect of the statements and declarations made by a testator is exhaustively treated. This construction is also in line with the decisions of this state. See *Rusling* v. *Rusling, 36 N. J. Eq. (9 Stew.) 603, 607, 608; Pemberton's Case, 40 N. J. Eq. (13 Stew.) 520, &c.*

Before reaching my conclusions in this case I carefully considered

I. The character and quality of the mind of testatrix, her physical condition and habits of life.

II. The nature of her will, with special regard as to whether it is reasonable and natural in its treatment of the natural objects of her bounty and other relatives and friends and her mental attitude toward them.

III. The amount of her property and her realization of its value.

IV. Her knowledge and appreciation of the testamentary disposition she had made of her estate.

V. The question whether, in view of all the evidence, her principal beneficiary has succeeded in sustaining the burden placed upon him by his indiscreet conduct.

## I.

Mrs. Cooper, considering her advanced age at the time she made her will and the subsequent codicil, was a woman of unusual mental physical vigor.

She kept an active supervision over her affairs, had an intimate knowledge of her investments and saw that her interest was promptly collected. She was of a genial and kindly disposition and appreciated the little attentions shown to her by others. She generally had a relative staying with her, but kept control of her domestic establishment.

There is not the slightest suspicion that she was mentally weak or unsound.

Dr. A. A. Lewis, who had been her family physician for at least twenty years, testifies to her good mental condition during the time he had known her.

He says her mind remained clear "up to the last forty-eight hours" of her life.

He also shows that she liked conversation and company.

In speaking of his business relations with her he says "she was always very precise with me."

From all the evidence it is clear that she was a self-reliant woman, with considerable shrewdness and decision of character.

She enjoyed traveling. During the winter of 1901 and 1902 she spent several months at West Palm Beach, Florida. Several times after the execution of the will of 1900 she visited her so-called adopted daughter, Mrs. Marks, at her home in New York State.

She showed in many ways that life was very pleasant notwithstanding the burden of years.

## II.

I will now review the evidence to determine whether the will and codicil in question are unnatural or unjust, and in that connection will first compare the treatment which the several beneficiaries received under the canceled will (which is said to have been executed by her on December 19th, 1888, and which has been offered in evidence) with that bestowed upon them by the will of May 26th, 1900, and its codicil.

(1) Mrs. Marks.

By the earlier will Mrs. Marks (then unmarried and styled "my adopted daughter, Myra Kenward Cooper") received $1,000 in cash and the household goods and furniture absolutely.

She was also given the use of the homestead for life or *"until she marries,"* together with the use of the residuary estate for life *"or until she marries."*

Under the new will and codicil Mrs. Marks receives $1,000 in cash, but not the furniture and household goods. Mrs. Marks's daughter, born since 1888, receives $500 under the codicil. Aside from the loss of the furniture and household goods Mrs. Marks receives the same amounts as she would have received under the will of 1888 had it now been admitted to probate, while her daughter also now receives the sum of $500.

Myra married Rufus B. Marks in 1889.

(2) Mrs. Lydia Wolfe.

Under the earlier will she was left $1,000. Under the later will and codicil she will receive exactly the same amount, $1,000.

(3) Mrs. Carrie Pruden, wife of Henry H. Pruden.

The bequest to her remains identical with that in the earlier will.

(4) The six children of Henry H. Pruden receive under the will of 1900 the same identical amounts left them under the will of 1888.

(5) Clarence C. Pruden now receives the same amount left him under the will of 1888.

In brief, every beneficiary under the will of 1888 receives under the will and codicil now before the court exactly the same amount of money as he or she would have received if the will of

1888 had now been admitted to probate, with the single exception of Henry H. Pruden, the half-brother of testatrix.

Of the eleven beneficiaries under the will of 1888 he is the only one to suffer from the new will.

Had the will of 1888 been probated at this time Henry H. Pruden would not only have been the executor, but he would, owing to the marriage of Myra, have received more than Charles F. Axtell can now receive under the will and codicil in question, because of the legacies now given to Edwin Pruden and Esther L. Marks.

Under the will and codicil now offered for probate Henry H. Pruden receives the vacant lot of twenty-five acres, situated near Morristown, which is non-productive and of uncertain value, and which, I should judge from the evidence, is worth certainly under $5,000.

It is well to note in this connection, however, that had Myra never married, Henry H. Pruden would not, aside from the executorship, have received any benefit under the will of 1888 until Myra's death, showing that in 1888 Mrs. Cooper did not think it necessary to make special provision for her half-brother and was not particularly solicitous about his welfare.

A comparison of the wills of 1888 and 1900, taken in connection with the testimony of the several witnesses and all the other evidence, shows pretty conclusively that Mrs. Marks, Mrs. Lydia Wolfe, Clarence Pruden, Henry H. Pruden and his six children were the persons of whom testatrix was especially fond. They were the persons with whom she was thrown in contact and with whom she was in constant intercourse.                •

Mrs. Marks, to be sure, was not a relative nor even a legally-adopted daughter. She is, however, called her adopted daughter in both wills and in the codicil. She lived with Mrs. Cooper from the age of five years until she was married, at the age of twenty-one, and was apparently nearer and dearer to her than anyone else.

Without any child of her own the affections of testatrix were centered upon Mrs. Marks and those of her relatives who lived near her, and who had in many ways become endeared to her.

These nine relatives (Lydia Wolfe, Clarence Pruden, Henry

H. Pruden and his children), together with Mrs. Marks and the wife of Henry H. Pruden, were the only persons remembered in the will of 1888, and are also the only persons mentioned in the will of 1900 and the codicil excepting Stephen H. Pruden, Edwin Pruden and the daughter of Mrs. Marks and the Axtells.

I have attached to these conclusions a memorandum showing the several persons named as relatives of Mrs. Cooper in the petition for probate.

It appears that the great majority of these relatives did not live in Morristown.

The testimony shows that testatrix had seen some of them at rare intervals and that many of them she had never seen at all. It is in evidence that she once told Lydia Pruden that "she had not remembered the Guerins in her will," that "they were amply provided for without any of her money."

I am convinced that the persons of whom she was especially fond, and who might properly be called the natural objects of her bounty, were Mrs. Marks and the nine relatives whom I have enumerated, namely, Mrs. Wolfe, Clarence Pruden, Henry H. Pruden and his six children, Lydia, Minnie, David, Harry L., Emma and Gertrude.

Curiously enough not a single one of these persons is objecting to the probate of the will and codicil now in question.

How would these persons in whom Mrs. Cooper was especially interested be benefited if the will is set aside?

If testatrix can be held to have died intestate Mrs. Marks and her daughter would receive nothing.

Henry H. Pruden being of the half-blood would have no interest in any of the real estate, and his share of the personal estate would probably prove to be no more valuable, if as valuable, as the real estate devised to him in the will now presented for probate.

The six children of Henry H. Pruden who receive $2,600 in all, under will of 1900, would receive absolutely nothing, as their father is still living.

Mrs. Wolfe might receive a trifle more, for while she would receive less cash she would have a small interest in the real estate which might a little more than offset the loss in cash.

Clarence Pruden would, unquestionably, be benefited if the will should be broken, but he is the only one of those who may be considered the natural objects of the bounty of testatrix who would be substantially benefited.

With regard to the suggestion of counsel that this court has power to set aside that part of the will under which the Axtells benefit and should exercise that power, I will state that, aside from the fact that I do not believe that any fraud or undue influence was exercised as to any part of the will or codicil, I feel certain that in no view of this case would it be proper to permit the partial intestacy that would result from such action.

It would be impossible to determine to what extent the specific legacies, and in particular the devise to Henry H. Pruden, had been tainted and improperly reduced.

In *Culhbertson's Appeal,* 97 Pa. St. 163 (at p. 173), Chief-Justice Sharswood, speaking for the supreme court of Pennsylvania, says:

"There may be a case where the alleged undue influence is applicable only to a single independent provision in a will, and that provision may fail, leaving the rest of the will to stand. It is certainly not this case, where the clause objected to is a residue, and that residue made up or largely increased by alterations made, as a jury may conclude, under the same influence for that purpose."

. I do not doubt but that in a proper case part of a will can be set aside because of undue influence. This has been frequently held in the English and American courts. See 29 *Am. & Eng. Encycl. L.* (*2d ed.*) 108.

So far as I am aware, the question has never been passed upon in this state. See, however, the comment made in *Harris* v. *Vanderveer,* 21 N. J. Eq. (6 C. E. Gr.) 561, 575.

If Mrs. Cooper's will had been tainted by fraud or undue influence, all of it would have to be set aside.

To my mind, a division of the estate of testatrix under the statutes of descent and distribution, would be more unnatural and inequitable than if made pursuant to the will and codicil in question.

The removal from the operation of the bounty of testatrix of

those in whom she was particularly interested, on the ground that her provisions for them had not been sufficiently ample would, in effect, give the bulk of her property to relatives for whom she did not care, in whom she took no interest, and many of whom she had never seen, and would work great injustice.

It is true that by so doing we would defeat her provisions for Axtell and his son. But is there anything unnatural in those provisions?

Mrs. Cooper was a very warm friend of Axtell and his wife.

She had become acquainted with Mrs. Axtell in 1883, and had known her husband much longer.

In more than twenty-five of the numerous letters from Mrs. Cooper to Axtell she refers in affectionate terms to Mrs. Axtell.

In some of these letters she expresses her appreciation of little acts of kindness extended to her by Mrs. Axtell.

It appears from the evidence of Dr. Lewis that Mrs. Cooper was very fond of Mrs. Axtell, and displayed great sympathy at the time Mrs. Axtell was threatened with blindness.

Minnie Pruden testifies that testatrix would frequently go and see Mrs. Axtell.

The letters also show the high esteem in which Mr. Axtell was held.

In one of them she addresses him as "my very dearest friend."

They also show that her lonely life was brightened through her association with the Axtell family.

Considering the relations of Mrs. Cooper with the Axtells the provision for the head of that family can hardly be called unnatural; however, we may question the wisdom of its bountiful character.

It is not unnatural that she should have wished to substantially remember a dear friend with whom apparently her business relations had always been satisfactory and to whose wife and family she had become greatly attached by pleasant, social intercourse extending over many years.

The only reason that this court has considered at length the question as to whether the will is natural or unnatural is for the purpose of ascertaining whether its provisions sprang from the natural impulse of the testatrix or resulted from coercion.

Except from that standpoint this court is not concerned in its reasonableness or justice, as anyone having mental capacity and acting freely on his own initiative and without coercion has a right to make an unjust will.

The possibility of establishing the will of 1888 on the ground that it was canceled through fraud or undue influence will not be considered by me, because I feel certain it was not so canceled, and further, because the question as to its cancellation is one in which the parties to this proceeding are not interested.

Not one of the eleven contestants and neither of the two proponents would be in any way benefited by its probate.

### III.

Mrs. Cooper was possessed of a sufficient income and estate to support her in comfort.

She was a woman of simple tastes, very economical in her mode of life and very thrifty.

She had the life use of the income from the estate of her husband who died in about the year 1877.

The evidence shows that estate to have been worth in the neighborhood of $29,000.

After the death of J. C. Youngblood in 1897 some partial settlement and distribution of the James J. Cooper estate was made so that its amount was reduced to about $18,000.

It does not appear what amount of cash Mrs. Cooper received through the settlement and distribution.

Mrs. Cooper at the time of her death had personal property, consisting principally of bonds and mortgages, which has since been inventoried at $21,692.39.

This amount included the value of her furniture and household goods appraised at $486.23.

The inventoried value of her personal estate will be considerably decreased by the expenses of administration and other charges.

No evidence has been presented to me, in this proceeding, showing what the indebtedness and other charges against her estate would amount to.

· She owned a house and lot on High street, Morristown, worth $5,500 or $6,000, and a vacant piece of land consisting of about twenty-five acres on the north side of the Baskingridge road, near Morristown.

What this twenty-five-acre piece is worth does not appear.

Testatrix valued it at $5,000, but that valuation, in view of other evidence, is probably somewhat excessive.

Testatrix kept close track of her investments.

In her letter to Rufus B. Marks, dated May 28th, 1900, she enclosed a statement showing that she then thought she was worth $13,800 aside from her real estate.

Axtell testifies that two or three years ago testatrix gave a thousand-dollar bond to her niece, Lydia Pruden.

This would seem to have been a proper recognition of the devoted service rendered to her by a favorite niece who resided with her a good many years and whose fixed compensation was extremely meagre.

What appears to have been an advantageous conversion of some of her real estate into personalty was made in 1902 when she sold her land on the south side of the Baskingridge road to her nephew, Harry Pruden, for $5,000, subject to a mortgage of $3,360. ·

In this way she apparently obtained $1,640 cash available for investment, got rid of a mortgage liability, and retained the tract to the north of the Baskingridge road (devised to Henry H. Pruden) free and clear of all mortgage encumbrance.

Axtell states that at one time testatrix told him she was saving from $800 to $1,000 a year, but it does not appear over what period she believed she was saving in that manner.

She apparently thought that she had increased her estate through her habits of economy and thrift.

I am unable to determine from the evidence just what Mrs. Cooper was worth in 1900 or prior to that time.

Her written and oral statements in that regard are only competent as they tend to show us her point of view.

In that respect they are extremely valuable, but they cannot, as above shown, be received as substantive evidence of the facts stated.

Enough has been developed in this case to show that testatrix was a shrewd, capable manager, and though very careful of her expenditures was exact and just in her dealings with others.

If she believed that her estate was increased through her own care and economical management she may for that reason have felt that the increase was peculiarly her own, and that no one of her relatives could complain if she acted in accordance with her own wishes and judgment and made Axtell a large beneficiary under her will.

She may also have looked upon that increase as a fund upon which she could make heavy drafts, in case she was obliged to live the life of an invalid for any considerable period before her death.

There is no doubt in my mind but that she was fully acquainted with the character of her property and realized its value.

## IV.

I will next consider whether Mrs. Cooper fully understood the nature of her will.

The contention that she did not realize the effect of the residuary clause and that she really believed that her brother Henry was the principal recipient of her bounty strikes me as being absolutely without force.

It is claimed that the specific legacy of $500 to Axtell tends to prove that Mrs. Cooper did not appreciate the value of her estate and thought the residue after the payment of the specific legacies would be small.

As a matter of fact, two days after the execution of the will, in her letter to Mr. Marks, above referred to, she enclosed a list of her securities showing that she believed that she had a considerable estate.

That letter certainly shows a secretive mind, and it may be that she did not object to having Marks believe that his wife would receive some considerable portion of her estate.

While the letter shows a lack of frankness it does not show that she was ignorant of what she had done with her estate.

I feel certain that she knew the contents of her will and codicil and the effect of their provisions.

Axtell says the will was read over to her in her presence at the time of its execution.

Witte, one of the attesting witnesses to the will, says, "she said she had read over the will and knew what was in it."

So far as the codicil is concerned, Axtell says that at the time of its execution he read it over to testatrix.

He further says that he delivered the will to her on the day of its execution and did not see it again until he drew the codicil, and that after the codicil was drawn Mrs. Cooper retained both will and codicil.

Even if the will was in the safe deposit box for one year, as it is claimed and I have no doubt but that such was the fact, she had equal control over it with Axtell.

Axtell's statement that both will and codicil were left with Mrs. Cooper at the time the codicil was executed is corroborated by other evidence.

It appears that both will and codicil were in her possession about a year and a half before her death, as she then handed to Mrs. J. H. Van Doren an envelope containing both documents, and Mrs. Van Doren pursuant to instructions from testatrix immediately handed it to her husband, the executor appointed under the codicil to serve with Axtell.

For the one and a half years that the will and codicil were in the custody of Mr. Van Doren they were, of course, under the control of testatrix and could have been canceled and replaced at any time without the knowledge or consent of Axtell.

The possession of the will and codicil by testatrix taken in connection with opportunity to cancel them which she had, over a long period of time, is strong indication that she was aware of their contents.

It has been recently held in the prerogative court of this state that "Where a testatrix, after the execution of a will, drawn according to instructions given one who conveyed them to the draftsman, has the executed will in her possession a sufficient length of time, and with the opportunity and ability to acquaint herself with its contents and she then preserves it, it will be conclusively presumed that the will was prepared according to her instructions, especially when it followed her pronounced in-

13

tentions, and provides for no unnatural disposition of her estate."

*In re Catharine McLaughlin's Case, 69 N. J. Eq. (3 Robb.) 479.*

See, also, *Brick* v. *Brick, 44 N. J. Eq. (17 Stew.) 282,* where it was held that "if a will is shown to have been in a testatrix's possession long enough for her to read it the proponent need not prove that anyone saw her read it or heard it read to her or in her presence because if she had the intelligence and capacity to read it herself the law will presume, if the opportunity was afforded her, that she was acquainted with its contents."

The existence of the codicil, drawn in 1904, which, in express terms, confirms the will, tends to prove that testatrix was well acquainted with the provisions of the will, as she would not have been likely to have made changes in it without familiarizing herself with its contents.

Her statement to Minnie Pruden that "she had made a will and remembered us, she had thought a good deal about making her will, and she thought some people would not be satisfied," also indicates that she was aware of its contents.

## V.

The question whether Axtell has sustained the burden placed upon him by his indiscreet conduct in the matter of drawing and attending to the execution of the will and codicil presented for probate has been answered by the evidence.

He placed himself in a very indelicate and highly improper position which made it necessary for him to produce voluminous testimony before this court.

I am satisfied by the documentary and oral proofs (without regard to Axtell's testimony and his emphatic statements that he in no way influenced testatrix) that at the time the will was drawn as well as at the time the codicil was drawn, Mrs. Cooper had fixed testamentary ideas as to the disposition of her estate.

She knew what she wanted, gave her instructions to Axtell and he followed them.

In this respect this case is different from *Farnum* v. *Boyd·*

above cited, where the testatrix had "unsettled testamentary notions."

The "independent judgment" required under *Farnum* v. *Boyd* has also been exercised by testatrix in this case.

All the evidence points to that conclusion.

In particular it is indicated by the statements and actions of testatrix in regard to the custody of her will and her statement to Minnie Pruden, above quoted, that she had given much thought to its making.

The rule requiring that a person disposing of his property by will, *must exercise a judgment independent* of the confidence induced by his confidential relationship with his legal adviser, must not be confused with the rule requiring *"proper independent advice,"* which is applicable in the case of a person who makes a voluntary deed to take effect in his own lifetime to one upon whom he is dependent for advice.

The law guards with peculiar care a person of advanced years, who, like King Lear, voluntarily deprives himself of his means of support in his old age, but is not so strict in the case of a person giving away his property by an instrument taking effect at his death when he no longer has any use for it himself.

In the former case, it must be shown that the donor had "proper independent advice."

In the latter case, it need only be shown that the testator exercised his "independent judgment."

Mrs. Cooper has been shown to have displayed independent judgment, and to have been free from that improper and undue influence which has been defined to consist "in the exercise of sufficient control over the person, the validity of whose act is brought in question to destroy his free agency and constrain him to do what he would not have done if such control had not been exercised." *Bennett* v. *Bennett, 50 N. J. Eq. (5 Dick.) 439.*

Axtell has supplemented the other evidence by repeatedly and emphatically denying ever having directly or indirectly influenced Mrs. Cooper as to the disposition of her property.

His testimony in this regard is entitled to respect. Vice-Ordinary Reed, speaking for the prerogative court in the *Sparks Case, 63 N. J. Eq. (18 Dick.) 242, 249,* says:

"The absence of any influence, which can be regarded as undue, must, in the main of necessity, be proved by the legatee himself. The testimony of the legatee, unless contradicted by some other credible testimony or discredited by its improbability, cannot be arbitrarily disregarded."

The evidence clearly shows that the case now before me is within the established rule laid down in *Bennett* v. *Bennett,* above cited, that "every person competent to make a will has a right to the aid of any person he may think proper to select, when he desires to put his testamentary wishes in form to have legal efficacy and if he exercises this right without improper influence or control, though he selects the person he intends to make his principal beneficiary, that fact, in the absence of evidence showing an abuse of confidence, constitutes no reason why probate should be denied to his will."

The proofs produced before me stand uncontradicted by any evidence produced by the contestants.

It has been shown to my satisfaction that Axtell did not abuse the confidence of testatrix.

The contention that he should, under the circumstances, have refused to accept her bounty is a question of ethics with which this court is not concerned.

I am fully convinced that the will and codicil in question are untainted by fraud or undue influence.

They represent the testamentary wishes of a woman of good mental capacity acting free from all moral and physical coercion and have been drawn strictly in accordance with her directions.

Her wishes must control this court.

An order will be made admitting them to probate as the last will and testament of Esther J. Cooper.

*Messrs. Vreeland, King, Wilson & Lindabury,* for the appellants Carrie L. G. Harrison, Helen Huff, Grace Guerin and and Johanna Guerin.

*Mr. John M. Mills,* for the appellants Isaac N. Pruden, Kate C. Briant, Georgianna Mandridge, Geneva M. Groendyke, Albert T. Pruden, Minnie M. Simonson and Mercy P. Mullen.

*Mr. Willard W. Cutler,* for the respondents Charles F. Axtell and Joseph H. Van Doren, executors.

*Mr. Charlton A. Reed, guardian at litem,* respondent *pro se.*

PITNEY, ORDINARY.

Counsel for the appellants do not controvert the principle of law adopted by the court below as applicable to the case. The contention is that the learned judge erred in his conclusions of fact.

My examination of the case convinces me that those conclusions are fully supported by the evidence, and that the respondent Axtell fairly sustained the burden of showing that the will was the product not of undue influence, but of the free and independent judgment of the testatrix.

The decree under review will be affirmed.