Francis L. Thompson and Jeanne Lommason appeal from a decree of the Orphans Court of Warren County reversing the decree of the surrogate of the same county admitting to probate a paper-writing dated August 22d 1942, purporting to be the last will and testament of Edward Nixon, deceased. *Page 118 
In the appeal from the surrogate's decision, the appellant advanced three reasons for revoking probate, but only one of the three, that of undue influence, was considered at the trial in the Orphans Court, and found to have been used by the appellant herein, Francis L. Thompson, a member of the bar of this state, the scrivener of the will, and a legatee therein to the extent of $2,500.
Decedent testator, Edward Nixon, was a bachelor, between sixty and seventy years of age; illiterate, but shrewd. He was successful in business, and amassed therefrom a fortune of approximately $65,000. He lived alone in an unpretentious one story two room building. He died November 6th, 1942.
From the time of his admission to the bar of this state in April, 1934, the appellant Thompson acted as attorney and legal adviser to the testator. He drew four wills for the testator, one in 1939, one in 1940, one in 1941, and the one here under consideration dated August 22d 1942. The 1940 will is in existence. It was received in evidence in the court below and marked Exhibit P-6. The 1942 will was also received in evidence, and marked Exhibit R-3. The latter exhibit will be herein refered to as the 1942 will. At or about the time of the execution of the 1942 will the 1941 will was destroyed in Thompson's office at the direction of the testator.
The residuary clauses of the 1940 and 1942 wills are the same. The wills differ in these respects: The 1942 will increases the bequest in the 1940 will to Roy Beers from $200 to $500; the bequest to Joseph Nixon from $1,000 to $1,500; it directs cancellation of a judgment held by testator against Donald and Grace Nixon; and makes the following additional specific bequests — Jeanne Lommason, $750; Francis L. Thompson, $2,500; Harriett Little, $3,000, and Delilah Aagaard, $3,000. Paragraphs ten and eleven of the 1942 will appear to be duplicates of paragraphs five and six of the 1940 will.
The evidence shows that testator called at Thompson's law office on Saturday, August 22d 1942, at or about 11:45 A.M., and there spoke to Thompson's secretary, Jeanne Lommason *Page 119 
aforesaid, and stated that he wished to have some papers drawn by Thompson. She thereupon told him to return after lunch, at or about 1:30 P.M. He returned at the time designated. Thompson was then engaged in a conference with clients. At its conclusion, Thompson spoke to the testator who told him that he wanted him to prepare his will. Thompson thereupon called Miss Lommason to his inner office and then and there in the presence of the testator dictated to her the provisions of the will. Miss Lommason used a day book which was lying on Thompson's desk for her stenographic notes. When Thompson finished the dictation of the will, she and the decedent retired to Thompson's outer office where she typed it. Thompson, in the meantime, was engaged with other clients in his inner office. While the will was being typed in the outer office, Mrs. Laura Thompson, the appellant's mother, entered that room. She had called there for the evident purpose of requesting money from her son, upon whom she was partially dependent. While she was there, a client of Thompson's, Alven Carpenter, entered to discuss some matter with him.
When she finished typing the will, Miss Lommason fastened its sheets together and placed it on her desk; she then put on her hat and coat and was in the act of leaving the office for the day when Owen C. Jones entered the room to see Thompson on a business matter. Thompson having finished his conference with his clients in the inner office went to the outer office where the decedent, Mrs. Thompson, Carpenter and Jones were waiting, picked up the will from Miss Lommason's desk and invited the testator to enter his inner office. He there and then said to the decedent: "Now, do you have anyone whom you would like to witness this will, any particular person?" The decedent said, "No. Couldn't you be a witness to it?" Thompson said, "No, not I. I am executor and I cannot be a witness, or if I get anything under the will." In answer to a question, Thompson said (page 58 of the record):
"A. I said, `You cannot witness the will if you get anything from the will.' That is the way I put it to him. And he said, `How about your secretary?' I said, `She went.' And *Page 120 
he said, `That is right.' And he said, `How about your mother and Mr. Carpenter out there?' I said, `That is all right if it is all right with you.' And I went to the door and called my mother and Mr. Carpenter in and I asked them if they would witness Mr. Nixon's will, and they said yes, they would witness his will; so they sat down — I recall the situation quite vividly, just how it was practically, how they sat there. They sat down and Mr. Nixon said, `How about reading it to me?' And I sat behind the desk and started to read it to him, and I read about a line or two and somebody knocked on the hall door, so I left and went out in the hall. * * * So I went out and saw the person out there and they wanted to discuss something with me, I think they were in a hurry, and I came back and asked Mr. Carpenter if he would read it, and he said he was not used to reading legal documents, and he would rather not: and my mother said no; and Mr. Nixon said, `How about Mr. Jones out there?' And I said, `All right, if he will read it.' And I went out and called to Mr. Jones, `Will you come in?' And I said, `Would you mind reading this will for Mr. Nixon?' And he said, `No, I wouldn't mind read it,' and he took the will and sat down in my own chair there and he said, `I never thought I would have the honor of sitting in a lawyer's seat,' or something like that; and he sat down there and I went out and he read the will, but I did not hear him read the will. * * * and when I came back in apparently the will had been finished reading and was laid on the desk, and I said, `Well, is everything all right, Ed?' He said, `Yes; that is just the way I want it.' So I picked up the will that laid in front of Mr. Jones, on my desk, and I picked up a pen and went over to where Mr. Nixon sat, and I said, `You will have to sign it.' And I said, `Wait a minute. Do you declare this to be your last will and testament?' And he said, `I do.' And I said, `Do you want Mrs. Thompson and Mr. Carpenter to witness it?' And he said, `I do.' And I said, `You sound more like a young bridegroom than an old bachelor.' And he said, `None of that stuff for me,' or something like that. And he said, `Where do I sign?' I showed him where to sign his name and he got down over the will and he signed his name, and I picked it up and took it over to my mother. *Page 121 
 Q. Were the two witnesses in the room at that time? A. Both of them sat right before my desk.
Q. Was the signing in the presence of those two witnesses? A. Yes, it was. So I took it over to my mother and she asked me where to sign, and I said, `On the top line, on that line,' and she signed there where I pointed out to her; and I took it over to Mr. Carpenter and he made some remark, I do not know what it was, whether he should sign underneath my mother's name, and I said to sign under my mother's name, and he signed underneath my mother's name; and I picked the will up and blotted it and folded it together and put it in an envelope that had been prepared by my secretary. I put it in there and sealed it and laid it on the desk, and Mr. Carpenter said, `Well, I guess you won't be wanting us any more,' and I said, `No,' and they got up, Mrs. Thompson, Mr. Carpenter, and Mr. Jones, and they went out in the other room, the waiting room."
That quoted testimony is supported by Mrs. Laura Thompson, Carpenter and Jones. It stands uncontradicted. The will was properly executed. Thompson retained the will.
The court below in its decree denying probate of the will, among other things said: "that the proponent has not by credible and convincing testimony overcome the presumption of undue influence placed upon him by the circumstances surrounding the drawing and execution of the said paper-writing purporting to be the last will and testament of Edward Nixon, deceased." I do not agree with this conclusion of the court below. I do not find in the record the slightest scintilla of evidence indicating the use of undue influence. I think the evidence is credible and most convincing that no undue influence was brought to bear upon the testator. Even if the ruling of the court below that these appellants were confronted with "a presumption of undue influence" were correct (and I do not think that it was for reasons which I shall hereafter state), in my judgment they by their uncontradicted and convincing testimony overcame, rebutted and negatived the alleged presumption.
The one essential element in undue influence as defined by our courts is that it "be such as to destroy free agency; *Page 122 
such as overpowers one's volition and constrains one to do that which one would not otherwise have done." In re Peppler,132 N.J. Eq. 421; 28 Atl. Rep. 2d 474.
An examination of the records fails to disclose any dominance over the testator whatever; on the contrary it clearly reveals the ascendency of the testator. He was a free agent to the fullest extent. He was a man of forceful character and handled his business dealings with intelligence and consequent profit. On page 67 of the record appears:
"Q. Do you know Mr. Nixon was a man of little education? A. I do not imagine he had too much education. You could tell that by his grammar. But he was a smart man."
His business successes were the result of an alert mind and a discriminating and sound judgment. There is nothing in the testimony that indicates that the testator was of weak or feeble mind and that he was not in complete possession of his faculties.
The basis of the bequest of $750 to Miss Lommason is explained by her in her testimony on page 100 of the record, line 40, which is as follows: "Number 5, I have written here, `Me, for favors and courtesy, $750.'" And page 101, lines 1 to 8, inclusive:
"By Mr. Herr: Q. How did that come to get in there? A. When Mr. Thompson came to that paragraph, he said, `Mr. Nixon wants to leave you something.' And I looked at Mr. Nixon and I said, `Me?' He said, `Yes. Do you want it?' And it just stunned me for a minute, and I wrote, `Me,' in the book. Mr. Thompson said he wanted to leave something to me because I had done favors and had been courteous to him."
And on page 103, lines 12 to 22, she testified:
"Q. What had you done for the testator that caused him to remark that you had done some favors for him? A. Well, I did a lot of things. On various occasions he would come in the office and Mr. Thompson would not be in, and he would want just small papers typed, notices for tenants' dispossession, and receipt sheets and different things like that, and I would type them for him without Mr. Thompson being there, and he would appreciate that a lot. And on different occasions *Page 123 
I called some man for him in regard to stock. I did not call the man but I would dial the number and he would call him."
In addition, Miss Lommason testified that the testator at or about the Christmas prior to the execution of the 1942 will had given her a Christmas gift.
Thompson, in his testimony justifying the decedent's bequest to him (page 61 of the record) in part said:
"Q. What did you do for him? A. Oh, I guess I did a hundred things for him. I drew wills and deeds and mortgages and bonds and contracts for the sale of property, and had them recorded, and made out receipts to his tenants, and notices to get out, and he came in there and had me count his money at times."
The relationship between attorney and client is largely administrative in character. The client determines what he wants done, and the attorney is the instrument of accomplishing his client's wishes. Only when the relationship goes beyond this and the mind of the attorney steps in and is substituted for the mind of the client that the relationship arises which causes the presumption of undue influence to come into existence. That situation certainly is not present in the instant case.
Vice-Ordinary Berry, in In re Raynolds, 132 N.J. Eq. 141;27 Atl. Rep. 2d 226: affirmed, 133 N.J. Eq. 344; 32 Atl. Rep.
2d 358, said:
"`It has been said that in order to shift the burden of proof to a proponent of a will, on an issue of undue influence, there must be some other elements "added to proof that testator's mind was enfeebled so that it was difficult to resist improper influence and the establishment of intimate confidential relationship." It is said that "slight circumstances are sufficient to be added. Among the elements which may be thus added, which have been mentioned in the authorities, are these: (1) the initiation of proceedings for the preparation of the instrument; (2) participation in such preparation; (3) presence at the execution of the will; (4) efforts to exclude the natural objects of testator's bounty from his society; (5) concealing the making of the will; and (6) *Page 124 
taking possession of the will. Wheeler v. Whipple, 44 N.J. Eq. 145; In re Howard, 9 N.J.L.J. 144; Cooper's Will, 75 N.J. Eq. 177; 76 N.J. Eq. 614; Morrisy's Will, 111 Atl. Rep. 26.'"
The Vice-Ordinary uses the term "intimate confidential relationship," indicating the relationship goes beyond the mere "confidential" stage.
Vice-Ordinary Backes, in In re Bishop, 96 N.J. Eq. 595;125 Atl. Rep. 384, quotes with approval In re Cooper Will, 75 N.J. Eq. 177; 71 Atl. Rep. 676, as follows:
"An attorney who draws or actively participates in the making of his client's will, by which he substantially benefits, has the burden cast upon him of establishing that it was not the result of undue influence."
This case went to the Court of Errors and Appeals under the title of Ward v. Harrison, 97 N.J. Eq. 309;127 Atl. Rep. 691, and Mr. Justice Kalisch, while not expressly setting aside the reasoning of the Vice-Ordinary, in effect does so in the following words:
"The courts of this state have not gone to the extent to hold that one actively participating in the drawing of a will, and who is chief beneficiary thereunder, is presumptively chargeable with undue influence. Such a circumstance may or may not be a factor to establish imposition upon the testator, for that is what is meant by the charge of undue influence, and, hence, whether or not there was imposition, must be disclosed by other circumstances and conditions than the mere drafting of a will and being a beneficiary thereunder."
In Bennett v. Bennett, 50 N.J. Eq. 439; 26 Atl. Rep. 573,
Vice-Ordinary Van Fleet sustains a will where the scrivener who had drawn it had been attorney for the testator for years, took two-fifths of a $25,000 estate; the testator was seventy-eight years old, and there was testimony from which lack of testamentary capacity might have been inferred. The court in an exhaustive opinion shows that undue influence consists of a destruction of free agency, and constraining the person whose will is brought in judgment to do an act which is against his will, and then he points out that where the will is drawn by the principal legatee, when the testator *Page 125 
is infirm and his capacity is doubtful, much closer scrutiny must be given to the scrivener's acts. In the opinion the Vice-Ordinary said:
"No matter if the will is drawn by the principal, or even sole, legatee, if it is made by a testator possessing adequate capacity, and it is shown that he knew its contents when he published it, and it appears to have been executed in the manner prescribed by the statute, the court must, in obedience to the law of the land, uphold it as the will of the testator and admit it to probate, unless satisfactory evidence is produced showing that it is the product of fraud."
In the instant case the circumstances surrounding the execution of the 1942 will is bare of any evidence suggesting the inference of fraud.
In In re Bottier, 106 N.J. Eq. 226; 150 Atl. Rep. 786,
Vice-Ordinary Backes says: "The coincidence that the lawyer who drew the will is also a legatee, without more, does not raise a presumption of undue influence." See In re Neuman's Estate,133 N.J. Eq. 532; 32 Atl. Rep. 2d 826.
I find nothing in the evidence to show that Thompson's mind was ever substituted for that of the testator or that he occupied a position of trust under which he performed acts for the testator that would normally be performed by the testator or client himself.
Thompson's testimony as to the preparation and execution of the will is most detailed and in my opinion it convincingly demonstrates the testator's complete freedom of action and the absence of any outside influence directing his testamentary intentions.
When the respondent alleged the exercise of undue influence, he then became charged with the obligation of sustaining it. That he has not done. At the most, the respondent submitted suspicious suggestions without any real evidence from which a legitimate inference of undue influence could be drawn.
The court in In re Babcock, 106 N.J. Eq. 228;150 Atl. Rep. 219, among other things said: "The legal presumption is always in favor of a will and one who contests its validity on the ground of undue influence must establish it clearly." *Page 126 
See In re Sullivan, 126 N.J. Eq. 182; 8 Atl. Rep. 2d 250;In re Loori, 20 N.J. Mis. R. 376; 28 Atl. Rep. 2d 281;affirmed, 132 N.J. Eq. 316; 28 Atl. Rep. 2d 288.
It is my opinion that the Orphans Court erred in admitting over objections questions and answers which were in no way related to the execution of the will. They, in part, are as follows:
"Dayton E. Little witness produced on behalf of contestants:
Q. What did he say to you, Mr. Little? A. To me?
Q. On that date? A. He told me that his will was in the safe deposit box of the Phillipsburg Trust Company.
 * * * * * * * Q. What did he say? A. He said he just found out shortly before that that he thought he had a first mortgage and he discovered that he had a second mortgage; he had just discovered that."
"Edith Eichlin, witness produced by the contestants.
Q. What did he say? A. Well, he was cross at him when he found out, over this mortgage, and Mr. Thompson had double-crossed him once before when Ed thought he was his friend."
These alleged conversations are in no way related to the execution of the 1942 will, and furthermore, they are alleged to have taken place approximately two months after the execution of the will aforesaid. They are talks in which the testator conveys information bearing on the existence of his 1940 will which he said was located in a safe deposit vault. And, also, about a mortgage transaction involving Thompson in which he, the testator, allegedly condemns Thompson's actions. The alleged talk of testator about the 1940 will with the witnesses was admitted in evidence presumably to show that there was no other existing will which was the product of the testator's mind.
Despite the testimony of respondent's witnesses, during the course of which the decedent allegedly said among other things that "Mr. Thompson had double-crossed him once before when Ed thought he was his friend, c.," the testator approximately two weeks before his death, had the appellant *Page 127 
Thompson draw a chattel mortgage for him (page 218, record); and the day before his death he visited Thompson's law office about a legal matter. This would indicate that the decedent testator's attitude toward Thompson was not hostile, or unfriendly.
The testator's declaration can only be admitted for the purpose of showing the condition of his mind at the time of the making of the statements. None of the aforesaid questions were germane to the circumstances surrounding the execution of the will or to the issue of undue influence, and they should have been excluded.
 It is stated by this court in In re Sullivan, 126 N.J. Eq. 182; 8 Atl. Rep. 2d 258:
"`Hence, in an inquiry respecting the testator's state of mind, before or pending the exertion of the alleged influence, his words, as well as his other behavior, may be shown for the purpose of bringing into view the mental condition which produced them, and through that, the antecedent and subsequent conditions. To this extent his declarations have legal value. But for the purpose of proving matters not related to his existing mental state, the assertions of the testator are mere hearsay.'"
Vice-Ordinary Berry in In re Raynolds, 132 N.J. Eq. 141;27 Atl. Rep. 2d 226, said:
 "DECLARATIONS OF THE TESTATOR
"So, too, the contestants, because of the difficulty of proofs, rely on the declarations of the testator made to Harold and Edward and to Mr. Groebe as proof of circumstances and conduct amounting to undue influence on the part of Mrs. Raynolds. Such evidence cannot be admitted to prove the facts as claimed, but may be used solely for the purpose of showing the state of mind of the testator at the time the statements were made. Rusling
v. Rusling, 36 N.J. Eq. 603; In re Anastasia Davis, 73 N.J. Eq. 617; In re Sullivan, 126 N.J. Eq. 182; The Rusling Will Case, 4N.J.L.J. 218."
There seems to be some factual error in the opinion of the court below as follows: The court says at the bottom of page 29, top of page 30 of the record, referring to Mr. Thompson *Page 128 
— "he procured the witnesses." Whereas, on page 58, lines 5 to 15, inclusive, testimony of Francis L. Thompson, and cross-examination, bottom of page 85 and top of page 86, and page 84, lines 28 to 33, it clearly appears that the testator named the witnesses and directed Mr. Thompson to call them.
The court says at page 31 of the record that "Thompson said that he used no form book while dictating and had no copies of Nixon's previous wills for reference." Thompson did not state that he had no copy of Nixon's previous wills for reference. The court says at page 33: "Thompson, on cross-examination, stated that he was unaware at the time that Nixon could neither read nor write." Thompson, in direct examination, at page 61, testified as follows:
"Q. Could he read, himself? A. Well, I do not know. He always had me read things. I would not say whether he could or could not. As an old man, I did not ask him that. He would generally have me read everything."
And at page 64:
"Q. During those eight years did you not have knowledge that this man could neither read nor write? A. To tell you the truth about it, it never came to my mind whether he could or not. A lot of people will say, when they have to sign papers, `Now, you read that back to me.'
Q. Was it not common knowledge that Mr. Nixon could neither read nor write? A. What do you mean by that? It was not common knowledge to me, because I could not say definitely whether he could or whether he could not."
The court further says at page 33: "Why it then seemed necessary for someone to read the will to Nixon was not explained." Thompson testified on page 58 as follows: "They sat down and Mr. Nixon said, `How about reading it to me?'"
I am satisfied that the court below was in error in reversing the order admitting the 1942 will to probate and in revoking the letters testamentary issued by the surrogate.
I shall advise a decree in conformity with this determination. *Page 129